Charles SEYMOUR, Plaintiff-Appellant,

v.

OCEANIC NAVIGATING CO., LTD., et al., Defendants.

M. R. HARRISON CRANE SERVICE, INC., Defendant-Third Party Plaintiff-Appellee,

v.

EAGLE SHIPPING CORPORATION, Third Party Defendant-Appellant.

No. 71–1167.

United States Court of Appeals, Fifth Circuit.

Jan. 19, 1972.

Feldman & Abramson, Donald Feldman, Atty., John M. Abramson, Miami, Fla., for Charles Seymour.

George F. Taylor, Jr., Spencer & Taylor, Miami, Fla., for co-appellant Eagle Shipping Corporation.

Wicker, Smith, Pyszka, Blomqvist & Davant, Erik J. Blomqvist, Atty., James H. Gray, Jr., Miami, Fla., for M. R. Harrison Crane Service Co.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiff-appellant, Charles Seymour, was injured while participating in the loading of the M/V Montego on May 22, 1967, at Miami, Florida. Seymour sued M. R. Harrison Crane Service for damages for personal injury sustained as a result of Harrison's alleged negligence. Third-party complaints, counterclaim and cross-claims followed. The trial judge, after hearing the case without a jury, entered a final judgment in favor of the defendant-appellee Harrison as to Seymour's claim for negligence and as to an indemnity claim brought against Harrison by Eagle Shipping Corporation, the company in charge of the stevedoring operation at the time of the accident. Seymour and Eagle appeal.

The M/V Montego has a large opening or hatchway on its weather deck. Below the weather deck was the shelter deck with openings for two hatches; the six-foot wide portion of the shelter deck between the two hatches is the "tween deck" or "dividing deck". On May 22, 1967, the M/V Montego was being loaded. Eagle Shipping-Corporation was in charge of the stevedoring operation, and Seymour was employed by Eagle. Eagle had, by oral contract, engaged the M. R. Harrison Crane Service to furnish cranes and personnel to assist with the loading. Harrison was operating two cranes from the dock to load the two hatches. Longshoremen brought pallets of cargo onto the dock from a nearby warehouse and attached them to the crane cables. The crane lifted the pallet from the dock to the vessel where longshoremen placed the cargo in the holds.

Hatch Number One was nearly filled at the time of the accident, so, instead of depositing the loaded pallets directly in the hold, the crane placed the pallets on the "tween deck" where longshoremen Bernard Conyers and Joseph Ragin handed the cargo to other men in the hold. Seymour was working inside Hatch Number Two. Because that hold was not yet fully loaded, the crane deposited the pallets directly into that hold.

At approximately 11:45 a. m. the crane transported a pallet for Hatch Number One toward the "tween deck". It is uncontroverted, and the trial judge found, that this pallet was "improperly loaded, that is, the cargo thereon extended over the sides of the pallet and was not balanced properly on the pallet". Several boxes fell off the overloaded pallet, into Hatch Number Two, injuring Seymour. There was contradictory evidence as to whether the boxes fell before or after Conyers and Ragin released the bridle around the cargo. It is uncontradicted, and the trial judge found, that "there was considerable dunnage and ropes in the area of the partition separating hatch #1 and hatch #2 on the 'tween deck'." The dunnage and ropes caused the pallet to tilt.

Seymour sued the shipowners, Oceanic Navigation Company and Pan American Mail Lines, for negligence and breach of warranty and the crane service, Harrison, for negligence. Harrison and the shipowners filed third-party complaints against Eagle, the stevedore, contending that Eagle was responsible for the accident, and Eagle counterclaimed against the shipowners and cross-claimed against Harrison. Before trial Seymour settled with the shipowners and the shipowners settled with Eagle. The case therefore went to trial on Seymour's claim against Harrison and Eagles' claim for indemnity against Harrison.

At the trial, the plaintiff presented only one witness on the question of liability, Bernard Conyers. Conyers testified as to his eyewitness account of the accident. Cross-Examination and impeachment by use of a prior inconsistent statement revealed contradictions in Conyers's testimony. On direct examination, he testified that he saw the pallet descending in an "overloaded and listing" condition and that he released the bridle from around the cargo before the boxes began to fall.[1] On cross-examination, defense counsel, by inaccurately summarizing Conyers's direct testimony, elicited contradictory testimony to the effect that Conyers did *not* loosen the bridle before the boxes fell.[2] Then, in an effort to impeach Conyers, the defense presented a statement prepared by

1. Q. Can you describe the motion in any way of the pallet at the time you first observed it? A. When I observed the pallet, the pallet was overloaded and listing. Q. When you say "listing," do you mean tilted? A. Like that, yes. Q. Can you describe the motion at all of any of the cargo? Did you see any of the cargo moving at that time? A. The top boxes was kind of sliding a little. Q. Do you mean the smaller cargo now, so that I understand you? A. Yes. Q. It was beginning to slide? A. Right. * * * Q. Can you tell me the manner in which this pallet began its descent from the time you first observed it with the cargo sliding or shifting? Can you tell me how it then came down to the dividing deck that you were on? A. It come over swinging and when it got over, just

before it hit exactly on the floor—it happened so fast and the cargo was starting to fall off the pallet. Q. Did you have an opportunity to release the bridle from the cargo before the boxes began falling? A. That's right.

2. Q. I think you said that when the pallet landed on that partition, immediately some boxes fell off of it, is that right? A. Yes. When he set it down there, it fell off the side and fell off. Q. And I think you also said that you didn't get a chance to touch the bridle or the brow on the pallet, is that right? A. I didn't get a chance to unloosen the bridle. Q. You didn't? A. That is, before the boxes fell. Q. When the pallet came down and landed on that partition area, you didn't get a chance to unhook the bridle or the brow? A. Right.

Conyers and Ragin three months after the accident.[3] The statement, although inconsistent with the cross-examination testimony, was consistent with the direct testimony in that it stated that Conyers had taken the bridle off the cargo before it fell. The statement, however, made no mention of the pallet descending in an overloaded condition.

3. JOINT STATEMENT OF BERNARD CONYERS AND JOSEPH RAGIN, dated August 31, 1967. (Handwritten)

The below individuals, Bernard Conyers—1531, N.W. 59 S.Ct.,—696–1815 and Joseph Ragin—439 N.W. 8 St., Apt.—, were working in the #2 gang with Charlie Seymour who is in the #1 gang back in May of 1967 when Charlie was hurt. ¶ At that time we were working amid the 2 hatches, #1 hatch & #2 hatch, unloading the pallets from one of the 2 M. R. Harrison cranes into the 1 hatch. ¶ The space we were working at was only about 5–6 ft. wide between the hatches. ¶ We were working aboard the Montego since 8 AM that morning. About 11:45 AM the crane lowered an overloaded pallot (sic) with some cardboard cartons about 6 ft. long and about 2–3 ft. square except one side which was angled, in addition to several other different sized cargo boxes on top of the longer ones. ¶ As the pallot (sic) was set down on the deck amid the 2 hatches and as we were about to release the brow from the pallot (sic) it was discoverd the pallot (sic) was overloaded. We released the brows from the pallot (sic) in the ordinary manner just was done with every pallot (sic). The hook & cable was then lifted away. Rope in the space caused the cargo to tilt. ¶ As we went to remove one of the boxes on top of the cargo, the overloaded pallot (sic) caused three of the longer boxes to fall over & into the hatch injurying Charlie. ¶ The 6 ft. cartons were situated side by side so that 2 6 ft. cartons took up & extended over the entire pallot (sic) both sideways & longways. These cartons were piled three or four high plus the other assorted cargo on top of that. When the brow was released, one side of the pallot (sic) was overweight which caused the longer cartons to fall over & injure Charlie. ¶ The pallot (sic) was not loaded or stacked properly because firstly there was too much cargo on the pallot (sic) to begin with, especially the longer boxes, and secondly, the longer cartons were stacked closer to one side of the pallot (sic) than the other. ¶ There's no question that the crane should

Also, several witnesses, including two crane operators employed by Harrison, an executive of Eagle, and Conyers, presented uncontradicted testimony that the crane operator has a clear view of the load on the pallet and that it is common practice and "common sense" for a crane operator to return an overloaded pallet to the dock.[4]

have been using a sling for the longer cartons because the pallot (sic) was too small to do the job. ¶ The pallot (sic) was loaded by someone who delivered the cargo to the warehouse—Pier 3, Bldg. 12 which is controlled by Eagle Shipping Co. It was improperly loaded at the time the cargo was delivered. ¶ It was dangerous for 2 cranes to be operating & loading both hatches at the same time because the 2 hatches on the Montego were so close together. ¶ I, Joseph Ragin took Charlie to Fisher Clinic in my car. He looked pretty sick to me & was in pain because he couldn't turn his head straight. ¶ I, Bernard Conyers, have seen Charlie try to do a few days work in late July, but he was favoring his neck & could hardly bend down. ¶ We swear the above statement is true to the best of our knowledge—this 31st day of Aug., 1967.

x/s/ Bernard Conyers
x/s/ Joseph Ragin

4. Q. If the flagman sees that the pallet is overloaded or improperly loaded or if he sees that it is tilted, shouldn't he give a stop signal to the crane operator? A. I think the crane operator would set it down before the flagman even told him to set it down. * * * Q. After he sees it over the side of the ship and he saw that it was tilted or it was improperly loaded, wouldn't he then give a stop signal? A. Yes. Because, the driver would have had it already on the dock before he reached that stage. * * * Q. What if the pallet was overloaded on the dock? Isn't it the duty of the longshoreman to say, "Wait a minute. This pallet is overloaded. Let's don't bring this thing on board." A. He can't tell whether it's overloaded until the crane picks it up.

* * * * *

THE COURT: Let me ask you this question, sir: In the cab where you operate this crane, is that located below the deck level of the MONTEGO or are you up high enough to where you can see the deck level and the hatch? THE WITNESS: I can see the deck level, the top. THE COURT: You can see the deck level? THE WITNESS: Right. BY

The trial court entered findings of fact and conclusions of law [5] and entered final judgments in favor of Harrison, both as to Seymour's claim for negligence and Eagle's claim for indemnity. Both Seymour and Eagle have appealed.

MR. TAYLOR: Q. Sir, when you bring a pallet down, the decision to bring it down under motor control or free fall is entirely your decision, is that not true, sir? A. Right. * * * Q. If you are down there on the pier and a load is picked up on a pallet and if that load starts going to one side immediately, what do you do, if anything? Before you start swinging it over to the ship, you have just picked it up and you get it off the ground and it starts to get lopsided on you. What do you do, if anything? A. I set it back down. Q. That is part of your instructions and your routine as a crane operator to do that, is that not true, sir? A. Well, it is just common sense that if something is going to fall, you are going to pull it back down until they make it right. Nobody tells you this. You do it on your. * * * Q. If that load is in midair or perhaps even above the ship and there is no place to actually set that load and the boxes start sliding or shifting, is it not true that you are going to bring that load back and set it back on the shore? A. I don't hold one in midair. If he calls for a pallet and changes his mind on the way up there and says to hold it, I put it back on the ground. THE COURT: Well, what he is asking you, sir, is that: Suppose he calls for a pallet—and this is a hypothetical question—and he tells you to lift and you lift it, and it gets up in the air there and, for some reason, those crates on there or the boxes or whatever they are start falling off. What would you do at that time? THE WITNESS: I would set it down. * * * Q. Do you have any obstructions, from where you sit in the cab, which may serve as an obstacle to your vision to that pallet in the way that cargo is either palletized or slung or whatever? Is there any obstacle between you and that pallet? A. No, I can see it at all times when I am picking it up.

5. FINDINGS OF FACT AND CONCLUSIONS OF LAW,
dated November 9, 1970.
(Caption omitted)

The Court, after trial, makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. The only liability witness called by the plaintiff was Bernard Conyers, a long-shoreman employed by Eagle Shipping Corporation, who was present at the time and place of the alleged accident giving rise to this lawsuit.

2. There was considerable dunnage and ropes in the area of the partition separating hatch #1 and Hatch #2 on the "tween deck".

3. When the pallet came to rest on the partition on the "tween deck", it was caused to tilt as a result of the dunnage and ropes beneath it, causing some of the cargo to fall from the pallet and striking the plaintiff.

4. The pallet was improperly loaded, that is, the cargo thereon extended over the sides of the pallet and was not balanced properly on the pallet.

5. The defendant, M. R. HARRISON CRANE SERVICE, INC., had nothing to do with the actual loading of the cargo unto the pallet.

6. The defendant, M. R. HARRISON CRANE SERVICE, INC., could not and did not know of the existence of the ropes and dunnage on the partition on the "tween deck".

7. Plaintiff's sole liability witness was not believable or entitled to any credence or weight because much of his testimony at the trial was in direct conflict and contradiction with his signed statement which was introduced into evidence at the trial.

8. The defendant, M. R. HARRISON CRANE SERVICE, INC., at all times, performed its work in a safe and workmanlike manner.

CONCLUSIONS OF LAW

1. The plaintiff failed to sustain his burden of proof in regard to the alleged negligence of the defendant, M. R. HARRISON CRANE SERVICE, INC.

2. The defendant, M. R. HARRISON CRANE SERVICE, INC., was not negligent in the manner in which it operated the crane and/or cranes at the time of the alleged accident.

3. As a direct result, the plaintiff may not recover by his cause of action from the defendant, M. R. HARRISON CRANE SERVICE, INC.

4. The defendant, M. R. HARRISON CRANE SERVICE, INC., did not breach any warranties to EAGLE SHIPPING for performing its work in a workmanlike manner.

Seymour urges us to reverse the decision of the district court because, in his view, the findings of fact entered by the court present a *prima facie* case of negligence. This we decline to do. Instead, we remand the case to the district court for clarification of, what we believe to be, self-contradictory and confusing findings.

In Finding of Fact Number 4, the court stated:

The pallet was improperly loaded, that is, cargo thereon extended over the sides of the pallet and was not balanced properly on the pallet.

This finding, when considered in light of the uncontradicted testimony that a crane operator has a clear view of the load on a pallet and returns an overloaded pallet to the dock as a matter of "common sense", would appear to establish a *prima facie* case of negligence. The findings may, however, be interpreted as denying liability, assuming the existence of a duty of care and a negligent breach of that duty, because of the absence of causation. In other words, because the district court found that "there was considerable dunnage and ropes . . . on the 'tween deck'" which "caused [the pallet] to tilt . . . causing some of the cargo to fall from the pallet and striking the plaintiff (see footnote 5), the court may have concluded that the longshoremen in the employ of Eagle were responsible for the accident in that they failed to remove the dunnage and ropes from the "tween deck". Alternatively, the trial court may have found the longshoremen responsible for the accident in that they, and not the employees of Harrison, improperly loaded the pallet. This interpretation of the district court's opinion is plausible in light of the court's care in finding Harrison "had nothing to do with the actual loading of the cargo unto the pallet". (See footnote 5)

Under either interpretation of the district court's finding as to causation, the negligence of the longshoremen would not absolve Harrison from liability but rather serve as a concurrent cause of the accident. Although the accident might not have occurred without the negligence of the longshoremen in leaving the dunnage and ropes on the deck or improperly loading the pallet, the act of the Harrison employees of transporting an overloaded pallet to the ship was a concurrent, contributing cause of the accident. Had the crane operator returned the pallet to the dock when he saw it was overloaded, as was common practice, the accident would not have occurred.

■ There is a second source of confusion in the opinion of the district court. The court found:

Plaintiff's sole liability witness [Conyers] was not believable or entitled to any credence or weight because much of his testimony at the trial was in direct conflict and contradiction with his signed statement which was introduced into evidence at the trial.

Despite the apparent total rejection of Conyers's testimony, the district court used portions of that testimony as a basis for its findings. There was no other evidence upon which the district court could have based its version of the accident reflected in the findings; Conyers was the only liability witness. Although a trial court may, of course, choose to reject certain portions of a witness's testimony while accepting other portions,

5. As a direct result of the foregoing, the third-party defendant, EAGLE SHIPPING CORPORATION, may not recover on its cross-claim for indemnity against M. R. HARRISON CRANE SERVICE, INC., inasmuch as there was no showing whatsoever of negligence on the part of the defendant, M. R. HARRISON CRANE SERVICE, INC.

DATED at Miami, Florida, this 9th day of November,

/s/ W. O. MEHRTENS
United States District Judge

the court's total rejection of Conyers's testimony leaves us in doubt as to the source of the court's findings. A trial judge may not use his disbelief of a witness as affirmative support for the proposition that the opposite of the witness's testimony is the truth. *See* Nishikawa v. Dulles, 1958, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659; Moore v. Chesapeake & Ohio Railway Co., 1951, 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547.

Nor could the trial court's conclusions be based on the signed statement of Conyers and Ragin describing the accident. (See footnote 3) The statement, initially used to impeach Conyers, was offered as substantive evidence by the plaintiff. The trial judge accepted the statement into evidence, but stated, at the close of all evidence, that he was "not considering it as substantive evidence of what actually happened . . ."[6]. This total rejection of the statement as substantive evidence is not only puzzling because it leaves the record barren of a possible source for the district court's findings, but also it totally ignores the fact that the statement was signed by Joseph Ragin as well as by Conyers. Ragin was not presented as a witness and, obviously, was not impeached.

■ Because the district court's findings of fact are self-contradictory, confusing, and inconsistent with the court's statements at trial, we must remand the case to the district court for clarification of the findings.

■ In addition to clarifying the findings on remand, the district court should consider the relevance and applicability of certain regulations of the Bureau of Labor Standards. These regulations, entitled "Safety and Health Regulations for Longshoring", appear in 29 C.F.R. Part 1504. Particular attention is directed to 29 C.F.R. § 1504.81 dealing with "Slinging" and 29 C.F.R. § 1504.82 dealing with "Building Drafts".[7] The

6. At the close of all evidence, the trial judge stated:

THE COURT: Gentlemen, I am going to rule, on the evidence before me, that the plaintiff has failed to sustain, by a satisfactory preponderance of the evidence, any negligence proximately contributing to his injury on the part of either M. R. Harrison of Eagle Shipping Corporation.

I am making that ruling in full consideration of the fact and with an understanding of the testimony of Mr. Conyers as to how the accident happened. However in my opinion, the credibility of Mr. Conyers has been seriously, if not fatally, attacked by the statement which he gave indicating a completely separate set of facts and circumstances, which statement to me was obviously prepared with the idea of imposing liability upon Oceanic Navigation Company, the ship owner; and that it was not prepared with an idea of imposing liability either upon M. R. Harrison or Eagle.

While the statement itself was received in evidence, I am not considering it as substantive evidence of what actually happened, but I am considering it as seriously affecting and completely eliminating any credibility to the present testimony of Mr. Conyers. .

I therefore find that the plaintiff has failed to prove, by a satisfactory preponderance of the evidence, any actionable negligence against either M. R. Harrison or Eagle Shipping Corporation and in turn, of course, as a result of, Eagle Shipping Corporation has no claim against M. R. Harrison.

Will counsel for M. R. Harrison prepare for me proposed findings of fact and conclusions of law?

I want the record to show that, in view of the ruling I have made, I have not considered or taken into consideration any element of damages or the medical testimony because, in my opinion, there has not been a sufficiently established case to entitle the plaintiff to recover from either of these parties.

We will be in recess until further notice.

7. § 1504.81 Slinging.
(a) Drafts shall be safely slung before being hoisted. Loose dunnage or debris hanging or protruding from loads shall be removed.

district court's findings would appear to establish a violation of these regulations, and a violation of these regulations would serve as a predicate for a finding of negligence. *See* Manning v. M/V Sea Road, 5 Cir. 1965, 358 F.2d 615.

Eagle Shipping Corporation appeals from the district court's final judgment denying Eagle's indemnity claim against Harrison. Because the trial court found that "there was no showing whatsoever of negligence" on the part of Harrison, Eagle's indemnity claim, of course, failed. (*See* footnote 5) If, on remand, the district court finds Harrison negligent in any manner or that Harrison breached its alleged warranty of workmanlike performance, the court should consider Eagle's claim for indemnity.

The case is remanded to the district court for proceedings not inconsistent with this opinion.

(b) Cargo handling bridles, such as pallet bridles, which are to remain attached to the hoisting gear while hoisting successive drafts, shall be attached by shackles, or other positive means shall be taken to prevent them from becoming accidentally disengaged from the cargo hook.

(c) Drafts of lumber, pipe, dunnage and other pieces, the top layer of which is not bound by the sling, shall be slung in such a manner as to prevent sliders. Double slings shall be used on unstrapped dunnage, except when, due to the size of hatch or deep tank openings, it is impractical to use them.

(d) Case hooks shall not be used for handling cases into or out of the vessel, unless the cases are specifically designed to be handled by this means.

(e) Bales of cotton, wool, cork, wood pulp, gunny bags or other similar articles shall not be hoisted into or out of the vessel by their straps unless the straps are of sufficient strength to support the weight of the bale and two hooks, each in a separate strap, are used.

(f) Loads requiring continuous manual guidance while in motion shall be provided with tag lines.

(g) No draft shall be hoisted unless the winch or crane operator(s) can

clearly see the draft itself or see the signals of any signalman associated with the operation.

§ 1504.82 Building drafts.

(a) Drafts shall be so built or such means shall be taken as to prevent cargo from falling from the draft.

(b) Hand loaded buckets or tubs used in handling bulk cargo shall not be loaded above their rims.

We may take judicial notice of these regulations. *See* 44 U.S.C. § 1507. Furthermore, judicial notice may be taken for the first time on appeal. *See* 5 Moore's Federal Practice § 43.09, p. 1369 and cases cited therein. Although this Court could properly consider the relevance of the regulations, we deem it in the interest of justice, since the case is being remanded for other reasons, that the district court consider the regulations in the first instance. The district court should determine (1) whether the regulations are applicable, (2) whether they were violated, and (3) whether any violation of the regulations proximately caused the injury to Seymour. If the district court feels that additional hearings are necessary to a full and fair consideration of the applicability of the regulations, he should hold such hearings.