[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15436

_____

D.C. Docket No. 1:98-cr-00263-DMM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAUL DE LA CRUZ-SOSA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 21, 2012)

Before HULL and BLACK, Circuit Judges, and WHITTEMORE,* District Judge.

PER CURIAM:

_____

*Honorable James D. Whittemore, United States District Judge, Middle District of
Florida, sitting by designation.

Raul De La Cruz-Sosa appeals the district court's revocation of his supervised release after having served a term of imprisonment for drug-related offenses. After oral argument, review of the parties' briefs, and consideration of the record, we reverse the district court's order revoking supervised release and remand for clarification of its findings.[1]

## I. BACKGROUND

### A.    Initial Criminal Proceedings

In 1998, Cruz-Sosa pleaded guilty to conspiring to distribute marijuana and cocaine, in violation of 21 U.S.C. § 846, and distributing cocaine, in violation of § 841(a)(1). He received a sentence of 135 months' imprisonment, followed by 5 years of supervised release. As a condition of supervised release, Cruz-Sosa was prohibited from possessing any firearm. Cruz-Sosa began his term of supervised release in March 2008.

On July 1, 2011, Cruz-Sosa's federal probation officer, Nelson Valenzuela, was told by an informant that he feared Cruz-Sosa because the latter "often possesses a firearm which he carries in the small of his back." Because Valenzuela knew that Cruz-Sosa was also on probation for a Florida conviction for third-degree theft, Valenzuela shared the tip with Christine Bullins, a state

_____

[1]We deny the government's motion to supplement the record on appeal.

2

probation officer.  Around eleven o'clock that same evening, Bullins and other probation and local officers drove to the house of Cruz-Sosa's girlfriend, Janet Rosillo-Dominguez ("Rosillo"), where Cruz-Sosa had been living for approximately five weeks.  Bullins and another state probation officer, Freddy Vidal, entered Rosillo's house and followed her to a bedroom that she shared with Cruz-Sosa.  The officers found Cruz-Sosa lying on the bed.  While Vidal went to search Cruz-Sosa's truck, Bullins searched the bedroom closet and found a loaded .45 caliber Taurus pistol with a full magazine and extra bullets, all concealed in a fanny pack.

## B.    Detention Hearings

Probation officer Valenzuela petitioned the district court to revoke Cruz-Sosa's supervised release, and a magistrate judge held two detention hearings about whether to detain Cruz-Sosa pending his revocation hearing.

At the initial detention hearing, Rosillo produced her permit to carry the firearm.  Rosillo testified that officers discovered the firearm inside the trunk of her car and the officers said that they were going to use the firearm against Cruz-Sosa.  On cross-examination, Rosillo acknowledged that Cruz-Sosa was a felon and was not allowed to possess firearms.  Rosillo admitted that she had shared the closet with Cruz-Sosa, but denied that the officers found the firearm in the closet.

At the second detention hearing, state probation officer Bullins testified about receiving the tip from Valenzuela, entering the house to find Cruz-Sosa lying on a bed adjacent to a closet, and finding the firearm in the closet on the same day as the tip. The defense introduced the testimony of Rosillo's son, Manuel Lopez, who was present in the house during the search. Lopez testified, inter alia, that Rosillo usually stored the firearm at her sister's house; the firearm was in his car[2] on the evening of the search; he heard the officers say that they found the gun in the car and would use it against Cruz-Sosa; and the officers failed to find any evidence in Rosillo's bedroom, given that Lopez did not see them carry anything out of the house. At the conclusion of the evidence, the magistrate judge ordered Cruz-Sosa detained without bond.

## C.    Revocation Hearing

Subsequently, the district court held a hearing to determine whether Cruz-Sosa's supervised release should be revoked. At the revocation hearing, federal probation officer Valenzuela testified about the informant's tip and sharing the tip with state probation officer Bullins. Bullins and Vidal testified that, when they came to search the house, Rosillo answered the door and led them to the bedroom.

---

[2]According to Lopez, the gun was found in his car, but Rosillo had bought the car for Lopez and used that car to pick-up the gun from her sister's house.

Bullins testified that she saw Cruz-Sosa lying in bed, escorted Cruz-Sosa to the living room, and discovered inside the bedroom closet a closed fanny pack containing the firearm and some ammunition.  With regard to the closet, Bullins testified that "it was a very tight space and the door didn't open up all the way and there was a lot of clothes in there.  It was a very packed closet."

The defense called Rosillo as a witness, who testified that she owned the firearm and that she always kept it inside a fanny pack in which she also stored her jewelry.  Rosillo produced her permit to carry the firearm and a receipt that stated that she purchased the firearm in December 2001 at the Miami Police Supply.  Rosillo testified that she stored the firearm at her sister's house because she wanted Cruz-Sosa to move in with her, and that she had retrieved the firearm on the day of the search because she was going on a trip and wanted her son to have a firearm for protection.  Rosillo also stated that, when Cruz-Sosa moved in with her, Cruz-Sosa's ex-wife would call numerous times, to the point that Cruz-Sosa had to change his number.  In one voicemail message, the ex-wife stated that Cruz-Sosa was a convict and that "she was going to put him back in prison."  Rosillo further testified that she never told Cruz-Sosa that she owned a firearm; Cruz-Sosa did not know that the firearm was in the house; and Cruz-Sosa had never seen the firearm.  On cross-examination by the government, Rosillo insisted

5

that the officers found the firearm in her car and that Cruz-Sosa had been standing in the hallway when the officers entered the house.

At the close of the hearing, the government argued that the evidence demonstrated Cruz-Sosa's constructive possession of the gun, given his proximity to the gun. The government also argued that Rosillo's testimony was not credible.

In response, Cruz-Sosa's defense counsel argued that he was not relying on Rosillo's testimony about the gun being found in the car and that he did not know whether this testimony was true or not. Defense counsel pointed out that he did not elicit this testimony. Rather, Cruz-Sosa's defense counsel argued that there was no evidence to show that Cruz-Sosa knew that there was a gun in the closet.

## D.    The District Court's Findings

After the parties made their closing arguments, the district court found that the gun was located in the closet next to the bed on which Cruz-Sosa was lying. The district court, however, found that Cruz-Sosa's proximity to the gun "probably would not be enough even on a preponderance of the evidence standard" to show that Cruz-Sosa knew about the gun, stating:

> Certain things are clear. First, I find that [Cruz-Sosa] was in the bed in the house. There was proximity. . . . Very close by is the closet where the Taurus revolver and two magazines were in a fanny pack.
>
> Now, if you stop there, I think there would be a stronger case. It

6

is clear the gun belonged to her. There's the receipt. But he had been living in the house for some time. Proximity is not enough. You need to have knowledge. I agree with you on that. He has to know the gun's there.

Usually I think people who are right next to a closet in which they keep some of their clothes know what's in that closet. But even that probably would not be enough even on a preponderance of the evidence standard.

(emphasis added).

The district court then found that Rosillo's testimony—that the gun was not in the house but was found in the trunk of her car—was not credible. The court inferred from this adverse credibility finding that Rosillo was deliberately lying to protect and exonerate Cruz-Sosa, which meant that Cruz-Sosa must have known about the gun. The district court found that Rosillo's deliberate false testimony constituted the principal evidence of Cruz-Sosa's guilt, stating:

What troubles me, frankly, here is the testimony of Ms. Rosillo-Dominguez. If she had come in and said, look, it's my gun, he never knew about it, I never told him about it that would be one thing. But her testimony is not that. She instead says the gun was not in the house, it was at my sister's house, and it was brought back that day and was in the car outside. And her testimony, which is contradicted by the other two witnesses, is that somebody, either the Hialeah Police or the Florida probation people, went out, searched her car, not his car, which is contrary to their testimony, got the gun, came in, put it in the closet. And that's not believable to me. I find that not to be credible evidence. So the question is why does she make that story up. And I think she—that story is just too strong an effort to try to exonerate him, and I think in the same way you look at flight or you look at someone who just tells an untruth I think that is a factor that really makes a big

7

<u>difference in my mind in terms of—it's true that's not him, but why is she making a deliberate falsehood to try to protect him but for I think the clear implication that he knew the firearm was there.</u>  And you couple that with the circumstance, and I don't put a lot of weight in it because we don't know the identity of the tipster or any of that, this is all started by someone who comes in and says I'm in fear of this guy and he's carrying a gun and they go to the house and lo[] and behold they find a gun and then the girlfriend lies about it.

(emphasis added).  The district court concluded that Cruz-Sosa violated the terms of his supervised release by constructively possessing the firearm in the closet. The district court sentenced him to 30 months' imprisonment, the low end of the guideline range, with no further term of supervised release.

## II. DISCUSSION

On appeal, Cruz-Sosa argues that the district court erred by treating the discredited testimony of Rosillo, a non-party witness, as substantive evidence of his guilt, rather than simply disregarding her testimony.  Cruz-Sosa also contends that, even if Rosillo's discredited testimony was properly treated as substantive evidence of his guilt, the government presented insufficient corroborating evidence that he possessed a firearm.

## A.    Applicable Legal Standards

A district court may revoke a term of supervised release whenever it "finds by a preponderance of the evidence that the defendant violated a condition of

8

supervised release." 18 U.S.C. § 3583(e)(3).[3] Cruz-Sosa was charged with

violating the condition of his supervised release that he not possess a firearm. See

18 U.S.C. § 3583(g) (mandating revocation of supervised release for possessing a

firearm). Possession of a firearm may be actual or constructive. United States v.

Perez, 661 F.3d 568, 576 (11th Cir. 2011). "Constructive possession of a firearm

exists when a defendant does not have actual possession but instead knowingly

has the power or right, and intention to exercise dominion and control over the

firearm." Id. Constructive possession may be proved by circumstantial evidence.

Id.

## A.    Rosillo's Discredited Testimony as Evidence of Guilt

As an initial matter, Cruz-Sosa concedes, and we agree, that the district

court did not err in disbelieving Rosillo's testimony. United States v. Copeland,

20 F.3d 412, 413 (11th Cir. 1994) ("The credibility of a witness is in the province

of the factfinder and this court will not ordinarily review the factfinder's

determination of credibility."). The main question before us is whether the district

court erred in treating witness Rosillo's discredited testimony as substantive

---

[3]We review the revocation of supervised release for abuse of discretion, United States v. Cunningham, 607 F.3d 1264, 1266 (11th Cir. 2010), and review related findings of fact for clear error, United States v. Almand, 992 F.2d 316, 318 (11th Cir. 1993). Questions of law are reviewed de novo. See United States v. Frazier, 26 F.3d 110, 112 (11th Cir. 1994).

evidence of Cruz-Sosa's guilt, rather than simply disregarding that testimony and determining guilt or innocence based on other evidence presented by the government.

It is well-established in this Circuit that testimony by a defendant in a criminal trial, "if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). As we have explained, "[d]efendants in criminal trials are not obliged to testify. And, a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case." Id. However, this Court has never extended this rule to non-party witnesses who testify for the defense. Although our circuit precedent is silent on the propriety of treating the discredited testimony of non-party defense witnesses as substantive evidence of guilt, we review several cases that provide some guidance on the issue.

We begin with our binding Fifth Circuit precedent in Seymour v. Oceanic Navigating Co., 453 F.2d 1185 (5th Cir. 1972), a civil case in which the plaintiff sued a crane operating company for negligence after being injured in a cargo-loading accident. The accident occurred when the plaintiff was helping load cargo inside the ship's hold, underneath a hatch in the deck, and several boxes fell on him through the hatch from a pallet that was being hoisted onto the deck by the

10

crane operator.  Id. at 1186-87.

At trial, the plaintiff presented one witness on the question of the defendant's liability, a witness who had observed the accident and described the accident during his testimony.  Id. at 1187.[4]  After the presentation of evidence, the district court made certain findings of fact regarding how the accident occurred, including the following: (1) the pallet was improperly loaded to begin with; (2) the crane operator placed the pallet on top of "ropes and dunnage" that were lying on the deck near the hatch, as a result of which the pallet tilted and the boxes fell into the hatch, injuring the plaintiff; (3) the defendant crane operator was not responsible for loading the cargo onto the pallet; and (4) the crane operator did not, and could not, know of the existence of the ropes and dunnage on the deck.  Id. at 1189 n.5.  The district court also found that the liability witness's testimony "was not believable or entitled to any credence or weight."  Id.  Based on these findings, the district court concluded that the defendant crane operator was not liable.  Id. at 1189 & n.5.

On appeal, the Fifth Circuit concluded that the district court's findings were "self-contradictory and confusing," in part because the district court appeared to reject the liability witness's entire testimony, but nevertheless used portions of that

---

[4]The liability witness's entire testimony is not described in Seymour.

11

testimony as a basis for its findings, given that "[t]here was no other evidence upon which the district court could have based its version of the accident reflected in the findings." Id. at 1190 (emphasis added). The Fifth Circuit stated:

> Although a trial court may, of course, choose to reject certain portions of a witness's testimony while accepting other portions, the court's total rejection of [the witness's] testimony leaves us in doubt as to the source of the court's findings. A trial judge may not use his disbelief of a witness as affirmative support for the proposition that the opposite of the witness's testimony is the truth.

Id. at 1190-91 (emphasis added). The Fifth Circuit remanded the case back to the district court for clarification of its findings. Id. at 1191.

Another decision dealing with a non-party's discredited testimony is United States v. Grubbs, 506 F.3d 434 (6th Cir. 2007), which concerned a defendant's direct appeal from a felon-in-possession conviction. In Grubbs, the defendant stood trial for illegal possession of, among other things, a Beretta nine-millimeter handgun. Id. at 436-37. The trial evidence showed that the gun was found in the room of the defendant's brother, in a house where the defendant's mother and brother lived, and where the defendant stayed the night before but visited only occasionally. Id. The government presented the testimony of a neighbor, who testified that the defendant previously had threatened him with a gun, although the neighbor could not tell whether that gun was the same as the Beretta charged in the indictment. Id. at 437-48.

12

The defense introduced the testimony of the defendant's brother, who testified that the Beretta gun was his and that the gun was discovered under a pillow on which he, the brother, regularly slept. Id. at 437. The defendant's mother also testified for the defense, stating that the defendant slept in a different room than where the gun was found. Id.

The Sixth Circuit reversed the defendant's conviction, concluding that there was insufficient evidence to show that the defendant constructively possessed the gun. Id. at 443. The Sixth Circuit reasoned: "Of course, the jury may choose not to credit testimony that [the defendant's brother] owned the nine-millimeter and we must accept such findings. But even if the jury disbelieved all the witnesses, that disbelief alone cannot constitute affirmative proof of constructive possession." Id. at 440.

The third relevant case is United States v. Mills, 29 F.3d 545 (10th Cir. 1994), where, like in Grubbs, the defendant Mills was convicted at trial for being a felon in possession of a firearm. Trial evidence showed that the two guns in question were found inside a compartment in a dining-room table in a common area of the house in which the defendant lived. Id. at 547. The table was owned by Judy Hall, a co-occupant of the house. Id. Hall testified that she placed the guns in the dining-room table without defendant Mills's knowledge and contrary

13

to his instructions.  Id. at 550.  On appeal, the Tenth Circuit reversed and held that the evidence was insufficient for conviction, stating: "if the jury disbelieved the entire defense testimony, that disbelief cannot constitute evidence of the crimes charged and somehow substitute for knowing constructive possession in this joint occupancy situation."  Id. (emphasis added).

Although the above cases may not be perfectly analogous to the present case, they all reflect the principles (1) that disbelief of a non-party witness's testimony cannot be used as the sole substantive evidence of the defendant's guilt of possessing a gun, such as to fill an otherwise fatal gap in the government's proof, and (2) that the fact finder may draw negative inferences from untruthful testimony, as long as there is other sufficient, affirmative evidence of guilt.[5]

Applying these principles, if the district court found Cruz-Sosa guilty based solely, or even primarily, on Rosillo's discredited testimony, that would be error. Thus, we look to whether there was sufficient, affirmative evidence independent of Rosillo's discredited testimony to justify the revocation of Cruz-Sosa's supervised release and what the district court said about that other evidence.

## B.    Other Evidence of Cruz-Sosa's Guilt

---

[5]See also United States v. Eisen, 974 F.2d 246, 259 (2d Cir. 1992) ("[T]he jury is free to draw negative inferences from an untruthful witness's testimony as long as there is affirmative testimony to supplement or corroborate those negative inferences.").

14

The government argues that, even if the district court erred in considering Rosillo's discredited testimony as substantive evidence of guilt, the government's other evidence alone was sufficient to find Cruz-Sosa guilty. Specifically, the government relies on evidence that: (1) the probation officer received a tip and later the same evening found the gun in a fanny pack in the closet, as described above; and (2) Cruz-Sosa lived in the house and used the bedroom where the gun was found, was in the bedroom when the officers arrived, and, thus, had dominion and control over the bedroom and closet where the gun was found, indicating that he constructively possessed the gun. Therefore, the government contends, the district court's error was harmless.

Indeed, we have stated multiple times that evidence that the defendant had control over the premises where the contraband was found was sufficient to find that the defendant constructively possessed the contraband. See, e.g., United States v. Woodard, 531 F.3d 1352, 1360 (11th Cir. 2008) ("A defendant's constructive possession of a substance can be proven by a showing of ownership or dominion and control over the drugs or over the premises on which the drugs are concealed." (internal quotation marks omitted)). It is undisputed that Cruz-Sosa had control over the premises (the bedroom and closet) where the gun was located.

15

However, control over the premises does not per se, or as a matter of law, constitute constructive possession of the contraband found therein in every case. Rather, control over the premises raises a <u>permissible inference</u> that the defendant possessed the contraband, and it is up to the fact-finder, not the appellate court, to make that inference.  See <u>United States v. Cochran</u>, 683 F.3d 1314, 1320 (11th Cir. 2012) ("[T]he essence of constructive possession is the power to control the contraband itself  and . . . control of the premises simply permits an <u>inference</u> of that power.").

The problem for the government here is that the district court's findings are unclear.  It is not entirely clear whether the district court chose to infer, from circumstantial evidence other than Rosillo's discredited testimony, that Cruz-Sosa constructively possessed the gun found in the closet.  The district court stated that: (1) "[u]sually I think people who are right next to a closet in which they keep some of their clothes know what's in that closet," and (2) "[b]ut even that probably would not be enough even on a preponderance of the evidence standard."  This statement could mean that (1) the district court permissibly chose not to infer constructive possession from Cruz-Sosa's proximity to the gun, or (2) the court erroneously believed that the proximity evidence was legally insufficient to raise an inference of constructive possession.  See <u>Cochran</u>, 683 F.3d at 1320 (stating

16

that it is the fact-finder's "choice and responsibility to draw inferences"). Certainly, in finding Cruz-Sosa guilty, the district court appeared to give primary weight to Rosillo's discredited testimony about the gun, and, as discussed above, this discredited testimony could not be used as affirmative, substantive evidence of possession. We note that the district court also mentioned in its findings the informant's tip that Cruz-Sosa was carrying a gun, but the court did not give this evidence much weight, stating that "we don't know the identity of the tipster or any of that." We do know that the tipster called, and the gun was found the same day. On the other hand, the gun was in a closed fanny pack in the closet with Rosillo's jewelry, and that pack belonged to Rosillo.

Because it is not entirely clear whether the district court chose, or would choose, to infer Cruz-Sosa's possession of the gun from circumstantial evidence outside Rosillo's discredited testimony, we remand this case to the district court for a clarification of its findings as to the charge against Cruz-Sosa.[6]

We reverse the district court's order of revocation and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

[6]Of course, the district court should not disregard those parts of Rosillo's testimony that it did find credible, such as the fact that Rosillo owned the gun and the fanny pack.