[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13409

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2011
JOHN LEY
CLERK

D.C. Docket No. 07-20714-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RENE GONZALEZ PEREZ,
a.k.a. Pipo,
LUIS FERNANDEZ,
a.k.a. Pacha,
ROBERTO DAVILA,
a.k.a. Chino,
AMILKA DEL MONTE,
a.k.a. Milka,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 26, 2011)

Before TJOFLAT, BARKETT and FAY, Circuit Judges.

PER CURIAM:

This case involves convictions for two Hobbs Act[1] conspiracies and related substantive offenses. The first conspiracy, Count 1 of the superceding indictment, charged two of the appellants, Rene Gonzalez Perez and Amilka Del Monte, with conspiring between August 2 and 23, 2007, to rob a check-cashing store in Ft. Pierce, Florida.[2] The second conspiracy, Count 5, grew out of the first conspiracy and charged all four appellants—Perez, Del Monte, Roberto Davila, and Luis Fernandez—and Reinier Pereier[3] with conspiring between August 8 and August 23, 2007, to rob a fictional cocaine stash house in Miami, Florida. The related offenses were charged in Counts 6, 7, and 8. Count 6 alleged that all appellants attempted to rob the cocaine stash house on August 23, 2007[4]; Count 7 alleged

_____

[1] The Hobbs Act, 18 U.S.C. § 1951(a) states, in pertinent part: "(a) Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery . . . or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both."

[2] The initial indictment charged Onel Salgado with the crimes charged in Counts 1, 5, 6 and 7 of the superceding indictment. He pled guilty to the Hobbs Act and carrying firearms offenses on April 29, 2008, and, on October 9, 2008, was sentenced to concurrent prison terms of 120 months and a consecutive term of 60 months, for a total of 180 months' confinement.
Appellants' trial began on March 9, 2009 and ended with the return of the jury's verdicts on March 30, 2009. The district court sentenced on June 30, 2009. Salgado was a prosecution witness at appellants' trial. On October 1, 2009, the district court granted the Government's Fed. R. Cri. P. 35 motion and modified his sentences to concurrent prison terms of 70 months.

[3] Pereier, Perez's nephew, was indicted and tried with appellants; he was acquitted on all counts.

[4] See supra note 1.

2

that they carried firearms in connection with such attempt.[5]  Count 8 charged Del

Monte with being a felon in possession of a firearm.[6]

In this appeal, all appellants challenge the sufficiency of the evidence to

support their convictions.  Alternatively, they argue that we should grant a new

trial because of several prejudicial errors the district court purportedly made both

pretrial and at trial.  Perez and Del Monte also challenge their sentences.

---

[5]  18 U.S.C. § 924(c) states, in pertinent part:

(1)(A) Except to the extent that a greater minimum sentence is otherwise provided
by . . . law, any person who, during and in relation to any crime of violence or
drug trafficking crime . . . for which the person may be prosecuted in a court of
the United States, uses or carries a firearm, or who, in furtherance of any such
crime, possesses a firearm, shall, in addition to the punishment provided for such
crime of violence or drug trafficking crime–

        (I) be sentenced to a term of imprisonment of not less than 5 years[.]


[6]  18 U.S.C. § 922(g) states, in pertinent part:

(g) It shall be unlawful for any person–

        (1) who has been convicted in any court of, a crime punishable by imprisonment
        for a term exceeding one year;

. . . .

to . . . possess in or affecting commerce, any firearm or ammunition;

    18 U.S.C. § 924(e)(1) provides that anyone "who violates section 922(g) . . . and has
three previous convictions . . . referred to in sections 922(g)(1) . . . for a violent felony or serious
drug offense, or both, committed on occasions different from one another, such person shall be
fined under this title and imprisoned not less than fifteen years[.]"

We first address appellants' sufficiency of the evidence arguments. With the exception of Del Monte's challenge to his convictions on Counts 7 and 8, these arguments are frivolous and require no discussion. We nonetheless relate the facts pertaining to Counts 1, 5, and 6 because they bear on our disposition of Del Monte's challenges to Counts 7 and 8 and to Perez's sentence appeal.

I.

The appellants did not move for a judgment of acquittal prior to the district court's submission of the case to the jury or after the jury returned its verdicts. See Fed. R. Crim. P. 29.[7] As a result, we will uphold appellants' convictions "unless [] do[ing] so would result in a manifest miscarriage of justice." United States v. Thompson, 610 F.3d 1335, 1338 (11th Cir. 2010) (quoting United States v. Pate, 543 F.2d 1148, 1150 (5th Cir. 1976)). "This standard requires the appellate court to find that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002) (citing United States v. Hamblin, 911 F.2d 551, 556–57 (11th Cir. 1990)). To make this determination, "we consider all of the evidence presented at trial," Thompson, 610 F.3d at 1338, drawing all reasonable

---

[7] Del Monte, joined by the other appellants, did move the district court for a new trial pursuant to Rule 33. The motion, however, did not state that the evidence was insufficient to support the jury's verdicts of guilt.

inferences and credibility choices in favor of the jury's verdict.  United States v.

Tarkoff, 242 F.3d 991, 993 (11th Cir. 2001).

We now relate the salient facts in this case under the standard described

above.  In late July 2007, a confidential informant (the "CI") for a joint

state/federal task force discussed potential robbery targets with Onel Salgado,[8]

including a check-cashing store in Ft. Pierce and a fictional cocaine stash house in

Miami.  Salgado expressed interest in both ideas, but their focus quickly centered

on the check-cashing store.  The CI described its operations and stated that the

owner frequently moved large sums of money to and from the store.

Following this conversation, Salgado solicited appellant Perez for assistance

in robbing the check-cashing store.  On August 2, 2007, Salgado introduced Perez

to the CI, and Perez stated his desire to take part in the Ft. Pierce heist.  Citing his

criminal expertise, Perez then began to direct the robbery's planning.  Specifically,

Perez insisted that he work with a particular partner, later revealed to be appellant

Del Monte.  Due to the CI's task force handlers' concerns about potential injuries

that could result from an attempted robbery of the store, the CI also encouraged

Salgado to consider robbing the fictional cocaine stash house.  Salgado wished to

conduct both robberies, but he put the stash house robbery on hold when a

---

[8]   See supra note 2.

potential conspirator refused to take part. With the cooperation of Perez and Del Monte, however, planning for the robbery of the check-cashing store continued.

On August 16, 2007, as the planned date for the check-cashing robbery neared, the task force received judicial authorization to intercept telephonic communications of Salgado and Perez. In a series of intercepted calls, Perez, Del Monte, Salgado, and the CI finalized their plans for the heist. The CI would park his car near the check-cashing store. As the owner left the store with a large sum of money, the CI would point him out to Perez and Del Monte; Salgado, driving the getaway car, would be parked nearby. Perez and Del Monte would then assault the owner, seize the cash, and flee the scene in Salgado's car.

The following morning, the CI, Perez, Del Monte, and Salgado met in a Miami shopping mall parking lot to put their plan into action. Perez and Del Monte then purchased pepper spray from a nearby gun shop, which they intended to douse the store owner with during the robbery. Afterwards, Perez, Del Monte, Salgado, and the CI drove towards Ft. Pierce in two cars to complete the robbery. The CI's task force handlers, concerned about injuries that could occur during the robbery, instructed the CI to abandon the scheme. Therefore, prior to their arrival at the store, the CI told his coconspirators that a contact had informed him that a large number of police had arrived at the store to break up a fight. Though Perez

6

and Del Monte argued that the robbery should still go forward in some form, the parties ultimately decided to return to Miami.

On the car ride back from the aborted check-cashing store robbery, Salgado told Perez and Del Monte about the potential cocaine stash house robbery. The hold-up would be made possible by the cooperation of a disloyal drug courier "Juan," who was actually an undercover Miami-Dade detective. "Juan" would receive the location of the stash house after collecting his bimonthly delivery of twenty to thirty kilograms of cocaine from the Tamiami Airport. He would then convey this information to the CI, allowing Salgado and his coconspirators to steal the drugs from armed guards brought to the stash house from Mexico. Perez and Del Monte embraced the proposal, adding that although more than three intruders would be needed, they "had the people for that."

Preparations for the robbery moved quickly. On August 21, 2007, the CI, Salgado, and "Juan" met to discuss their progress. Salgado reported that Perez and Del Monte wanted to overpower and immobilize the stash house guards shortly after they learned the stash house's location. They would then relieve "Juan" of the cocaine upon his arrival. "Juan" agreed with the plan and advised Salgado that the next shipment would arrive two days later, on August 23, 2007. Immediately following this meeting, Salgado called Perez to inform him of the

7

shipment's arrival. Perez stated that he would "call the guys" and subsequently contacted appellants Fernandez and Davila. The next evening, Salgado called Perez to confirm that the cocaine would arrive the following afternoon. Perez then called an unidentified male to locate firearms for "work" the next day.

In the early afternoon of August 23rd, the day of the planned robbery, Salgado, Perez, Fernandez, Del Monte, and Pereier met at Perez's apartment to discuss the heist; though Davila was not present, he and Fernandez exchanged three phone calls during this time. Perez stressed the importance of completing the robbery that night, as the next cocaine shipment would not arrive for another twenty days. While the robbery crew all expressed their willingness to go forward, they also wished to meet "Juan" beforehand. Therefore, Salgado, Del Monte, and Fernandez left Perez's apartment, picked up the CI at a nearby restaurant, and returned.

At Perez's apartment, the CI apologized for "Juan's" absence and recounted the robbery's details. In particular, the conspirators discussed the need to be armed given the near certainty that the show of deadly force would be necessary to succeed. For example, Fernandez described how the Mexican guards would "kill you" to protect the drugs. Perez asked Fernandez if Davila would supply the necessary weapons. Fernandez replied that Davila had "four weapons and a

shotgun," including a machine gun, and stated that they would need five hoods and plastic handcuffs. Perez noted that the machine gun would intimidate the guards. Because the transportation of guns would increase their risk of detection, they decided that the firearms would be transported in a separate vehicle. If police stopped that vehicle, the other car would create a distraction to allow it to escape.

After the CI stated that "Juan" would contact him within an hour, Fernandez and Davila exchanged two telephone calls; Davila arrived shortly thereafter. When the CI announced that he received "Juan's" call, Perez and his nephew placed a long firearm and a handgun into a black bag. Davila, Fernandez, and the CI carried this bag from the apartment and placed it in the rear of the CI's car. Davila took additional firearms from his car and put them in the CI's vehicle.

At this point, Salgado, Perez, Del Monte, Fernandez, Davila, and Pereier entered Perez's SUV and began following the CI to the pre-robbery rendezvous with "Juan." Throughout the 30 to 40-minute journey, Del Monte, Fernandez, and Davila phoned the CI to discuss the plan. Task force enforcement officers stopped the robbery crew's car just short of its destination under the pretext of controlling traffic around a vehicular accident. The officers searched the car and found Del Monte in possession of five knit stocking caps and pepper spray; Perez and Davila both possessed knives. A search of the CI's vehicle uncovered five loaded

9

firearms: a .12 gauge shotgun, an AK-47 rifle, a .38 caliber revolver, a .9mm Berretta, and a .44 magnum.

A.

To obtain a conviction against any of the four appellants on Count 7, for violating 18 U.S.C. § 924(c), the Government had to prove beyond a reasonable doubt that the defendant "(1) knowingly (2) possessed a firearm (3) in furtherance of any drug trafficking crime for which he could be prosecuted in a court of the United States." United States v. Woodard, 531 F.3d 1352, 1362 (11th Cir. 2008). To obtain a conviction against Del Monte on Count 8, for violating 18 U.S.C. § 922(g), the Government had to prove beyond a reasonable doubt that the defendant "knowingly possessed a firearm and had been previously convicted of a felony." United States v. Gunn, 369 F.3d 1229, 1235 (11th Cir. 2004). Thus, under both statutes, the Government had to prove the defendant's knowing possession of a firearm as a key element of the offense.

Possession of a firearm may be either actual or constructive. United States v. Iglesias, 915 F.2d 1524, 1528 (11th Cir. 1990). Constructive possession of a firearm exists when a defendant does not have actual possession but instead knowingly has the power or right, and intention to exercise dominion and control over the firearm. See Gunn, 369 F.3d at 1235 (citations omitted). A defendant's

10

presence in the vicinity of a firearm or mere association with another who possesses that gun is insufficient; however, at the same time, "[t]he firearm need not be on or near the defendant's person in order to amount to knowing possession." United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004) (citing United States v. Winchester, 916 F.2d 601, 603–04 (11th Cir. 1990)) (holding that a firearm found behind his couch when the defendant was not home was sufficient for a conviction under 18 U.S.C. § 922(g)). As long as the Government proves, through either direct or circumstantial evidence that the defendant (1) was aware or knew of the firearm's presence and (2) had the ability and intent to later exercise dominion and control over that firearm, the defendant's constructive possession of that firearm is shown. United States v. Beckles, 565 F.3d 832, 841 (11th Cir. 2009).

Significantly, the second element of constructive possession is satisfied if the defendant intended to exercise dominion and control of the gun through another. Gunn, 369 F.3d at 1235 ("The defendant may exercise [] dominion and control either directly or through others." (citations omitted)). Thus, a defendant's knowing participation in a joint criminal venture in which a particular firearm is intended to play a central part permits the jury to reasonably conclude that the defendant constructively possessed that gun. See, e.g., United States v.

11

McAnderson, 914 F.2d 934, 947–48 (7th Cir. 1990) (upholding a finding of constructive possession where the gang leader "was aware of the violence that had been planned and knew that the weapons in [a gang member's] possession would be used to commit [violent] acts."). This is true even if the defendant never intended to use the firearm himself—the defendant shares his coparticipants' intent and jointly possesses the gun as part of the criminal enterprise centering around possession of the gun.

B.

Del Monte argues that the evidence presented at trial did not indicate that he constructively possessed the firearms being transported by the CI to the purported robbery site.[9] Specifically, he claims that the evidence did not establish either element of constructive possession—that Del Monte knew of the guns presence in the CI's vehicle or that he had the power to exercise dominion and control over them. Thus, as he states in his reply brief, "[t]here was no evidence upon which a rational trier of fact could find that [he] knowingly possessed a firearm, and his convictions for possession of a weapon by a convicted felon and use and carrying

---

[9] It is undisputed that Del Monte was not in actual possession of the firearms at the time of their discovery; the firearms were in the CI's vehicle.

12

of a firearm during a drug offense should therefore be vacated." Del Monte Reply Br. at 3.

As the following discussion highlights, however, Del Monte's characterization of the evidence is incorrect. The record evidence supports a reasonable conclusion that Del Monte had both (1) knowledge of the guns being transported to the robbery site and (2) intent that those guns be used—either by him or his coparticipants—in the robbery of the fictional cocaine stash house. Thus, Del Monte constructively and jointly possessed the guns.

1.

According to Del Monte, the evidence adduced at trial does not permit a reasonable inference that he knew about the guns found in the CI's car. Instead, the Government only proved his "mere presence" at Perez's apartment, and that "mere presence" did not yield the inference that he knew about the guns. Del Monte notes that, unlike his coconspirators, the Government did not present any tape recordings in which he explicitly discussed the use of firearms. In sum, "the government proved nothing more than [his] proximity and mere association with someone else who may have possessed a firearm." Del Monte Br. at 27. If this was all that the Government's evidence established, Del Monte might prevail

13

because, as discussed, a defendant's presence in the vicinity of firearms, standing alone, does not permit a finding of constructive possession.

The Government, however, did produce sufficient evidence for reasonable finder of fact to conclude that Del Monte knew of the guns' presence. To start, Del Monte was well aware of the dangerous nature of the operation: robbing armed guards of twenty to thirty kilograms of cocaine. As they planned to overcome the armed guards with force, Salgado told Del Monte and Perez that they would need additional people. On the day of the operation, with Del Monte present, Fernandez stated that "things [would] get hot" if they killed one of the guards in the robbery attempt. Less than a minute later, Del Monte expressed his desire to take part despite the risk, stating: "[W]e're talking about good dough. A good retirement." These projections of violence were sufficient for the jury to reasonably conclude that the coconspirators intended that the guns play a central role in carrying out the criminal venture; as Salgado testified at trial, "[i]t's assumed if you are going to rob people who are armed, you have to take weapons."

This general awareness of the need for guns buttresses the evidence presented concerning the events that transpired within Perez's "very small" apartment. Fernandez, with Del Monte present, discussed the specific guns that

14

Davila would provide for the robbery, including an AK-47 machine gun.[10]

Martinez also testified that guns were displayed at the time the group began to "mobilize[]" for the robbery.[11] Moreover, the tape recording of the proceedings inside the apartment, as well as Salgado's testimony, revealed that the group consciously waited to depart for the robbery until they received word that the guns had been placed in the CI's car for transportation to the robbery site.

The foregoing evidence, taken collectively, sufficiently permitted the jury to infer that Del Monte knew of the presence of the firearms being transported to the intended crime scene.

2.

Del Monte's awareness of the guns was not sufficient, by itself, to establish his constructive possession of them. Rather, the inquiry must turn to the second element of constructive possession: whether the Government proved that Del Monte had the right and intention to later exercise dominion and control over the

---

[10] Del Monte argues that the Government's reliance on his presence in Perez's apartment at the time the guns were discussed and displayed "ignores the fact that there were many individuals present in the apartment that evening, coming and going, smoking marijuana and playing video games. According to the CI, the apartment consisted of a "very small" room. Given this circumstance, a reasonable jury could have found that Del Monte listened to the conversation that took place while he was present.

[11] Although Salgado testified that he did not see any guns inside Perez's apartment, credibility determinations lie with the jury and the jury here reasonably could have relied upon the CI's testimony as indicative of whether guns were seen in Perez's apartment.

guns, either personally or through others. Regardless of whether Del Monte intended to use any of the guns himself, the Government met its burden on this element through evidence of Del Monte's direct involvement in a criminal enterprise centered around the use of the firearms.

The task force discovered five guns when they made their arrests. Five is the same number of stocking caps discovered on Del Monte's person. The jury could reasonably infer from this evidence that five of the conspirators—presumably all except the CI—intended to wear the stocking caps, each using a gun. But even if Del Monte never intended to use a gun himself, his possession of the five stocking caps directly implicated him in the attempted robbery. This fact, combined with the intent of his coconspirators to use guns to overcome the armed guards in order to carry out the robbery, was sufficient to establish Del Monte's intention to exercise dominion and control of a firearm.

Viewed in a light most favorable to the Government, the evidence at Del Monte's trial permitted a reasonable jury to conclude that Del Monte, jointly with his coconspirators, constructively possessed the guns.[12] Consequently, we

---

[12] The district court properly instructed the jury as to this meaning of constructive possession as follows:

> The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may also have sole possession or joint possession.

16

encounter no difficulty in concluding that affirming Del Monte's convictions on Counts 7 and 8 will not constitute a manifest miscarriage of justice.

## II.

The appellants, as alternative relief, argue that they should be afforded a new trial based on a number of errors the district court allegedly committed pretrial and at trial. Only two require any discussion. The first is advanced by Fernandez; the second by all four appellants.[13]

---

A person who knowingly has direct physical control of something is then in actual possession of it. A person who is not in actual possession, but who has both the power and the intention to later take control over something, either alone or together with someone else, is in constructive possession of it.

If one person alone has possession of something, that possession is sole. If two or more persons share possession, such possession is joint.

Whenever the word "possession" has been used in these instructions, it includes constructive as well as actual possession and also joint as well as sole possession.

[13] The following arguments are meritless and thus require no discussion. They are that the district court erred or abused its discretion in the following respects:

1. In denying their pretrial motion for severance;

2. In overruling Fernandez's objection as to the admission into evidence, under Federal Rule of Evidence 404(b), of his involvement in a previous home invasion in which he left a mask bearing his DNA and obtained one of the firearms seized by the task force agents when they searched the CI's vehicle following appellants' arrests;

3. In denying the motions of Perez, Del Monte, and Davila for severance because of the court's admission of the evidence relating to Fernandez's involvement in the home invasion;

4. In admitting into evidence, through the testimony of a task force agent, a video tape recording of appellants' arrests;

5. In overruling appellants' objections to the court's jury instructions on the elements of the Hobbs Act, especially the "affects commerce" element;

6. In refusing to grant the defense motion for a mistrial—made following closing argument to the jury and after the court instructed the jury on the law—on the ground of prosecutorial misconduct. The appellants' argued that the prosecutor improperly bolstered the testimony of prosecution witness Salgado and commented on the defendants' invocation of Fifth

A.

Fernandez argues that the district court violated his Sixth Amendment right to compulsory process by denying his pretrial motion for an order compelling Ernesto Rojas to testify as a defense witness at the appellants' trial. Rojas had been convicted of making a false statement to a federal agent. While Rojas was in custody, Davila's investigator obtained an affidavit from him which stated, in Spanish, that Salgado and Joel Triana, both Government witnesses, told him of their willingness to perjure themselves. Specifically, they would falsely implicate Davila in the criminal activity involved in the case.

When informed of this, Davila moved the district court pursuant to Federal Rule of Criminal Procedure 15 for an order requiring Rojas to appear for deposition.[14] The court granted the motion. Before Rojas appeared for deposition, a magistrate judge appointed an attorney to represent him. After consulting with Rojas, the attorney informed Davila's counsel that Rojas would invoke the Fifth

---

Amendment rights.

[14] Rule 15(a)(1) provides that: "A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice."

By the time Davila filed his Rule 15 motion, Rojas had served his sentence for the false statement offense and was on supervised release. Because he had been in the United States unlawfully, Rojas, though on supervised release, was being detained by U.S. Immigration and Customs Enforcement pending his removal from the United States.

18

Amendment and refuse to answer any questions. Rojas would do so, the attorney said, because he feared that if he testified in conformance with what he said in the affidavit, he would be prosecuted for perjury. The deposition went forward as ordered, but Rojas, citing the Fifth Amendment, refused to answer counsel's questions.

Fernandez, on behalf of all defendants, filed a renewed Rule 15 motion to depose Rojas. His motion recited Rojas's invocation of the Fifth Amendment and asserted that Rojas had no basis for the invocation. Fernandez therefore asked the court to compel Rojas to answer counsel's questions. The district court rejected the assertion and denied Davila's motion.

We review the district court's decision to honor a witness' invocation of his Fifth Amendment right against self-incrimination for abuse of discretion. United States v.Van Deveer, 577 F.2d 1016, 1018 (5th Cir. 1978);[15] see United States v. Boothe, 335 F.3d 522, 525 (6th Cir. 2003). Although a witness's invocation of this privilege conflicts with a defendant's Sixth Amendment right to compulsory process, "such conflict long ago was resolved in favor of the witness's right to silence." United States v. Cuthel, 903 F.2d 1381, 1384 (11th Cir. 1990) (citing

---

[15] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Alford v. United States, 282 U.S. 687, 694, 51 S. Ct. 218, 220, 25 L. Ed. 624 (1931)).

While a witness must have reasonable cause to invoke the Fifth Amendment protection, Hoffman v. United States, 341 U.S. 479, 486, 71 S. Ct. 814, 818, 95 L. Ed. 1118 (1951), we do not require a high showing to meet this reasonable cause standard.  See United States v. Fortin, 685 F.2d 1297, 1298 (11th Cir. 1982) (upholding a witness's invocation of the privilege against self-incrimination unless it is "'perfectly clear' from a careful consideration of all the circumstances that their testimony could not 'possibly' have had a tendency to incriminate" (emphasis added) (quoting Hoffman, 341 U.S. at 488, 71 S. Ct. at 819)).

Fernandez argues that the district court erred in failing to hold a hearing to determine whether Rojas had reasonable cause to refuse to answer counsel's questions.  We are not persuaded; the court had sufficient, uncontested evidence before it on which to find that Rojas could plausibly fear that his answers, in contradicting his signed affidavit, could lead to a charge of perjury.  Notably, the court found that the circumstances under which Davila's investigator took the affidavit made it likely that Rojas, in answering counsel's questions, would contradict statements he made in the affidavit—some of which were incomplete—and thus risk prosecution for perjury.  See Ohio v. Reiner, 532 U.S.

20

17, 21, 121 S. Ct. 1252, 1254, 149 L. Ed. 2d 158 (2001) (stating that the Fifth Amendment protects those "who otherwise might be ensnared by ambiguous circumstances." (quoting Grunewald v. United States, 353 U.S. 391, 77 S. Ct. 963, 421, 1 L. Ed. 2d 931 (1957)). Taking these incomplete statements and the circumstances surrounding the investigator's taking of Rojas's affidavit into account, we find no abuse of discretion in the court's denial of Fernandez's motion.

B.

Appellants argue that the district court erred in denying, without an evidentiary hearing, Perez's pretrial motion to suppress all evidence the task force obtained through court-ordered electronic surveillance of calls to and from cellular phones owned by Perez and Salgado.[16] They contend that this wiretap surveillance should not have been ordered because the Government failed to demonstrate, as required by 18 U.S.C. § 2518(1)(c),[17] that it needed such surveillance. The district court denied the motion, finding that the task force agent's affidavit, submitted to

---

[16] Del Monte and Fernandez formerly joined in Perez's motion; Davila's counsel joined Perez, Del Monte, and Fernandez in objecting to the issuance of the wiretap order.

[17] Section 2518(1)(c) requires each application for interception of electronic communications to provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

21

the court in support of the task force's application for the wiretap order, demonstrated the need for electronic surveillance.[18]

"A district court's denial of a motion to suppress evidence is reviewed as a mixed question of law and fact, with the rulings of law reviewed de novo and the findings of fact reviewed for clear error, in the light most favorable to the prevailing party." United States v. De la Cruz Suarez, 601 F.3d 1202, 1213 (11th Cir. 2010) (citing United States v. Boyce, 351 F.3d 1102, 1105 (11th Cir. 2003).

The "necessity" requirement in § 2518 ensures that law enforcement does not use electronic surveillance when less intrusive methods will suffice. See United States v. Kahn, 415 U.S. 143, 153 n.12, 94 S. Ct. 977, 983, n.12, 39 L. Ed. 2d 225 (1974) (Stating that § 2518 "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."). Section 2518 does not "foreclose electronic surveillance until every other imaginable method of investigation has been

---

[18] The motion to suppress failed to allege that the statement(s) the task force agent made in his affidavit were false or were made with reckless disregard for the truth. As a result, the district court did not err in denying the request for an evidentiary hearing. See Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must . . . [contain] allegations of deliberate falsehood or of reckless disregard for the truth").

22

unsuccessfully attempted," United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984) (quoting United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978)); however, it does require the Government to show why alternative measures are inadequate for "this particular investigation." United States v. Carrazana, 921 F.2d 1557, 1565 (11th Cir. 1991) (quoting United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985)) (emphasis omitted).

The appellants argue that the Government's success in obtaining evidence prior to receiving permission to intercept electronic communications demonstrates that the "necessity" requirement was not met.[19] The partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary. See United States v. Fernandez, 388 F.3d 1199, 1236-37 (9th Cir. 2004) (concluding that the Government met the "necessity" requirement despite "two confidential informants . . . [who] were able to provide significant information"). Indeed, we have held that district courts did not err under similar circumstances. See De la Cruz Suarez, 601 F.3d at 1214 n.7 (finding

---

[19] For example, a recorder on the CI's person recorded several discussions the conspirators had about illegal activities. In addition to this recorder, the task force also used physical surveillance, toll records, cell cite information, and pen register information while investigating the conspirators' activities.

that the "necessity" requirement was met despite the Government's use of confidential informants and consensual monitoring).

The agent's affidavit recounted numerous ways in which the Government's investigation failed to reveal important evidence. For example, the compartmentalization of information prevented the CI from learning the identity of potential robbery targets and crew members. Even if the Government possessed sufficient evidence to prosecute Salgado prior to the wiretap, it had only limited knowledge of the full extent of his criminal activities and his coconspirators. As a result, it "is unrealistic to require the termination of an investigation before the entire scope of the [conspiracy] is uncovered and the identity of its participants learned." Hyde, 574 F.2d at 869 (quoting United States v. Armocida, 515 F.2d 29, 38 (3d Cir. 1975)).

Further, the Government's successful prosecution of many similar sting operations without the use of a wiretap does not demonstrate that they failed to meet the "necessity" requirement in this case. By requiring the Government to demonstrate need in each individual case, § 2518 implicitly recognizes that all investigations of a particular type do not necessarily require use of the same investigative techniques. The agent's affidavit described the limitations of alternative surveillance methods in this particular investigation. Based on this

evidence, the district court reasonably concluded that the Government needed to conduct electronic surveillance on Perez and Salgado's cellular phones.

Accordingly, the court did not err in denying the motion to suppress evidence obtained from the court-ordered electronic surveillance.

### III.

As indicated previously, the jury found Perez guilty of the conspiracies charged in Counts 1 and 5, the attempt to rob the stash house charged in Count 6, and the carrying of firearms in connection with the stash house robbery charged in Count 7. The district court sentenced Perez to concurrent prison terms of 80 months on Counts 1, 5, and 6; and a consecutive prison term of 60 months on Count 7.

Perez appeals all four sentences on the ground that the district court committed plain error when it failed to afford him his right of allocution as required by Federal Rule of Criminal Procedure 32.[20]

---

[20] Rule 32(i)(4), <u>Opportunity to Speak</u>, states:

(A) <u>By a Party</u>. Before imposing sentence, the court must:

(I) provide the defendant's attorney an opportunity to speak on the defendant's behalf;
(ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and
(iii) provide an attorney for the government an opportunity to speak

Perez also challenges his sentences for Counts 1, 5, and 6 on two additional grounds. First, he argues that the district court committed plain error in enhancing the base offense level of 20 by an additional three levels pursuant to U.S.S.G. § 2B3.1(b)(2)(E) for possession of a dangerous weapon—pepper spray—during the conspiracy to rob the check-cashing store.[21] Second, Perez asserts that the district court committed plain error in failing to articulate on the record, as required by 18 U.S.C. § 3553(c)(2), its rationale for varying upward from the Guidelines sentence range of 57 to 71 months' imprisonment; the court imposed sentences of 80 months.[22] See Gall v. United States, 552 U.S. 38, 50, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007) (stating that the district court "must adequately explain the

---

equivalent to that of the defendant's attorney.

(emphasis added). Fed. R. Crim. P. 32(i)(4)(A).

[21] Section 2B3.1 also provided the base offense levels for the Counts 5 and 6 offenses. The court separated Counts 1, 5, and 6 into separate groups. Pursuant to the U.S.S.G. § 3D1.4 adjustment, the total offense levels for the three counts became 25. That level coupled with a criminal history category of I yielded a sentence range of 57 to 71 months' confinement.

[22] Section 3553(c) states, in pertinent part:

The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence–

. . . .

(2) is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described.

26

chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing") (citing <u>Rita v. United States</u>, 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (U.S. 2007)).[23]

Where a party fails to seasonably object to a district court ruling, we review the ruling only for plain error. <u>United States v. Straub</u>, 508 F.3d 1003, 1010–11 (11th Cir. 2007). To find reversible error under the plain error standard, we must conclude that: (1) an error occurred, (2) the error was plain, (3) the error affected substantial rights in that it was prejudicial and not harmless, and (4) the error seriously affected the fairness, integrity, or public reputation of a judicial proceeding. <u>United States v. Dorman</u>, 488 F.3d 936, 938 (11th Cir. 2007). Where the district court, as required by <u>United States v. Jones</u>, 899 F.2d 1097, 1103 (11th Cir. 1990), <u>overruled on other grounds by</u> <u>United States v. Morrill</u>, 984 F.2d 1136 (11th Cir. 1993) (en banc), offered the defendant the opportunity to object to his sentences, this court will not entertain an unraised objection "unless refusal to do so would result in manifest injustice." <u>Id.</u>

We begin our consideration of Perez's sentence appeals by addressing the Rule 32 issue. We conclude that the district court failed to afford Perez his right

---

[23] Perez argues that we should find plain error as indicated in the above text because he failed to call the errors to the district court's attention after it imposed sentence, even though the court asked for the parties' objections, if they had any.

of allocution as Rule 32 requires.  The failure constitutes plain error and a manifest injustice, requiring the vacation of Perez's sentences and the remand of his case for resentencing.  In light of this disposition, we need not address the two additional grounds on which Perez challenges his sentences on Counts 1, 5, and 6.

The right of allocution provides a defendant "an opportunity to plead personally to the court for leniency in his sentence by stating mitigating factors and to have that plea considered by the court in determining the appropriate sentence."  United States v.Tamayo, 80 F.3d 1514, 1518 (11th Cir. 1996).  "As early as 1689, it was recognized that the court's failure to ask the defendant if he had anything to say before sentence was imposed required reversal."  Green v. United States, 365 U.S. 301, 304, 81 S. Ct. 653, 655, 5 L. Ed. 2d 670 (1961) (Frankfurter, J., plurality opinion).  Although criminal procedures have progressed significantly since the seventeenth century, "[n]one of these modern innovations lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation."  Id.  Allocution continues to "ensure that sentencing reflects individualized circumstances," United States v. De Alba Pagan, 33 F.3d 125, 129 (1st Cir. 1994) (citing United States v. Barnes, 948 F.2d 325, 328 (7th Cir. 1991), while maximizing the "perceived equity of the process."  Id. (quoting Barnes, 948 F.2d at 328).  Consequently, a defendant's right of

allocution, which is codified in Federal Rule of Criminal Procedure 32, remains firmly entrenched in our criminal jurisprudence.

Prior to sentencing Perez, the district court asked, "[w]ill the defendant be allocuting[?]" Immediately after the district court posed the question, Perez and his attorney conferred privately for an unspecified time period. Defense counsel then stated: "No, Your Honor. He doesn't wish to address the Court." The record indicates that all statements from the court and counsel were conveyed to Perez through an interpreter.[24]

Although the cold record does not indicate whether the court directed its question to the defendant, his attorney, or both, Perez may reasonably have viewed the statement—given its wording—as a question directed only to his attorney. Notably, the court's question used formal legal language and did not resemble comments the court previously addressed to the defendant personally.[25] The use of an interpreter does not change this analysis, as we assume that the interpreter's translation mirrored the court's statement to counsel.

---

[24] The record does not indicate whether Perez's attorney was fluent in Spanish.

[25] For example, a prior statement from by the court reads: "Mr. Gonzalez Perez, we're here for your sentencing hearing. Have you had the opportunity to review the presentence report, the addendum to that report, the Government's response and your attorney's omnibus sentencing memorandum?" In response to the court's question, Perez replied through an interpreter. In contrast, the court's statement regarding allocution included the formal legal term "allocute," was not directed to the defendant personally and was answered by defense counsel, not the defendant.

On a number of occasions, "[w]e have explicitly held that the requirement of Rule 32[(i)(4)(A)(ii)] is not satisfied when the court does not address the defendant personally concerning the defendant's desire to allocute but instead addresses defendant's counsel only." United States v. Gordon, 518 F.3d 1291, 1299 (11th Cir. 2008); United States v. Prouty, 303 F.3d 1249, 1251 n.1 (11th Cir. 2002) ("We reject the Government's argument that directing comments to the lawyers suffices to comply with [Rule 32].").

Nevertheless, the Government argues that the court's question and Perez's ensuing conversation with counsel adequately alerted Perez of his right to allocute; none of our prior cases cited above contained a similar conversation with defense counsel. The Government also argues that Perez expressed an informed declination of the opportunity to allocute through his attorney's post-conversation statement to the court. We find that the record does not support the Government's arguments.

That the district court's question to counsel, which the interpreter repeated verbatim to Perez, did not include the words "speak or present any information to mitigate the sentence," Fed. R. Crim. P. 32(i)(4)(A)(ii), does not, standing alone, determine whether the district court denied Perez his right of allocution. We do not require the district courts to mechanically follow a specific script. See De Alba

30

Pagan, 33 F.3d at 129 (stating that "we do not attach talismanic significance to any particular string of words").  What we require is that the district court ensures that the defendant knows of his right to speak or present information that might convince the court to impose a favorable sentence.  Our inquiry, then, is whether the district court's colloquy with the defendant is the "functional equivalent" of what Rule 32(i)(4)(A)(ii) prescribes.  Id.  If it is, we will not find error.

To find functional equivalency, the record must demonstrate that "the court, the prosecutor, and the defendant must at the very least [have] interact[ed] in a manner that shows clearly and convincingly that the defendant knew he had a right to speak on any subject of his choosing prior to the imposition of sentence." United States v. Rivera-Rodriguez, 617 F.3d 581, 605 (1st Cir. 2010) (quoting United States v. Mescual-Cruz, 387 F.3d 1, 11 (1st Cir. 2004).  Any "doubt" that this has taken place "should be resolved in the defendant's favor."  De Alba Pagan, 33 F.3d at 129.

In the present case, the record falls far short of this high standard.  Instead, the record simply denotes two things.  First, defense counsel conferred privately with Perez for an unspecified period of time after the court asked counsel whether the defendant would "be allocuting."  We do not know what they said to one

another through the interpreter during that time.  Second, Perez did not object when his attorney stated: "No, Your Honor.  He doesn't wish to address the court."

Rule 32(i)(4)(A)(ii) requires the district court to protect the defendant's right of allocution.  Counsel has a Sixth Amendment obligation to provide the defendant with competent representation, but whether counsel should address the defendant precisely as the court should will depend on the circumstances of the moment.  We thus do not assume that counsel has, in effect, acted for the court and that the defendant receives counsel's message as if it were delivered directly to him by the court.

To avoid litigation from ambiguous records, district courts should leave "no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing."  Gerrow, 232 F.3d at 833-34 (quoting Green v. United States, 365 U.S. 301, 305, 81 S. Ct. 653, 655, 5 L. Ed. 2d 670 (1961)).  In this case, the record leaves significant doubts as to the defendant's knowledge of his right to allocute.  Therefore, we conclude that the district court committed error.

The district court violated the express language of Rule 32(i)(4)(A)(ii).  In addition, Eleventh Circuit precedent clearly establishes that statements made to counsel do not adequately protect the defendant's right of allocution.  Prouty, 303 F.3d at 1251 n.1.  As a result, we also find that the error was plain.  See United

32

States v. Carruth, 528 F.3d 845, 846 n.1 (11th Cir. 2008) (stating that "[f]or a plain error to have occurred, the error must be one that is obvious and is clear under current law.") (quoting United States v. Humphrey, 164 F.3d 585, 588 (11th Cir. 1999)).

Although Perez establishes the first two prongs of the plain error rule, he "bears the burden of demonstrating that the plain error 'affected [his] substantial rights.'" Prouty, 303 F.3d at 1252 (quoting United States v. Olano, 507 U.S. 725, 734, 11 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). Denial of the right of allocution is "tantamount to denying [the defendant] his most persuasive and eloquent advocate." Prouty, 303 F.3d at 1253 (quoting United States v. Adams, 252 F.3d 276, 288 (3d Cir. 2001)). Consequently, we presume that the denial of a defendant's right to allocute was prejudicial whenever the possibility of a lower sentence exists. Carruth, 528 F.3d at 847 n.4 (citing Prouty, 303 F.3d at 1252-53). In the present case, the court's error affected Perez's substantial rights because his sentences of 80 months for Counts 1, 5, and 6 exceeded the lower end of the Guidelines sentence range, 57 months.

Finally, Perez satisfied the fourth prong of the plain error rule because denial of the right to allocute affects the fairness, integrity, and public reputation of judicial proceedings. Prouty, 303 F.3d at 1253 ("Because allocution plays a

central role in the sentencing process, the denial of this right is not the sort of isolated or abstract error that does not impact the fairness, integrity or public reputation of judicial proceedings" (quoting Adams, 252 F.3d at 288) (internal quotation marks omitted)).

Where the appellant meets all four prongs of the plain error standard, "we have discretion to order correction of the error and will do so 'in those circumstances in which a miscarriage of justice would otherwise result.'" Id. at 1252 (quoting Olano, 507 U.S. at 736, 113 S. Ct. 1770). "[F]ailing to give a defendant the opportunity to speak to the court directly when it might affect his sentence is manifestly unjust." Id. at 1253. Accordingly, we conclude that the district court committed reversible error when it failed to inform Perez of his right of allocution and did not impose the lowest possible sentence within the applicable guidelines.

The error requires the vacation of Perez's sentences and the remand of his case so that he can be afforded his right of allocution. His sentencing hearing will therefore resume with the district court addressing him personally, "to permit [him] to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii).

IV.

Del Monte, like Perez, was found guilty on Counts 1, 5, 6, and 7 and sentenced to concurrent prison terms of 80 months on Counts 1, 5, and 6 and a consecutive prison term of 60 months on Count 7. Del Monte was also convicted on Count 8, for being a felon in possession of a firearm, and sentenced to a consecutive prison term of 180 months, for a total term of imprisonment of 320 months. Del Monte now appeals his sentences on Counts 7 and 8.

A.

Del Monte claims that his Count 8 sentence should be set aside because the jury did not receive evidence and did not find that he had been convicted of a violent felony or a serious drug offense on three different occasions, so as to render him subject to imprisonment for a minimum of fifteen years under 18 U.S.C. § 924(e)(1). Del Monte cites <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), for the proposition that a prior conviction for purposes of § 924(e)(1) (which prescribes a mandatory minimum prison sentence of 15 years), if not admitted by the defendant, has to be found by a jury, but properly acknowledges that this court has rejected that proposition.[26] <u>See</u> <u>United States v. Gibson</u>, 434 F.3d 1234, 1246-47 (11th Cir. 2006) ("The

---

[26] Del Monte presented the claim to preserve the issue for subsequent review. Del Monte Br. at 28-29.

35

government need not . . . prove beyond a reasonable doubt that a defendant had prior convictions for a district court to use those convictions for purposes of enhancing a sentence." (quoting United States v. Burge, 407 F.3d 1183, 1188 (11th Cir. 2005)). We therefore affirm the Count 8 sentence.

B.

Del Monte claims that the "except" clause of 18 U.S.C. § 924(c) gave the court discretion to run his Count 7 sentence concurrently, rather than consecutively, with the sentences for Counts 1, 5, and 6. We previously rejected this argument, construing the "except" clause to require consecutive sentences. See United States v. Tate, 586 F.3d 936, 947 (11th Cir. 2009) (rejecting an argument that the district court erred in concluding that it was required by § 924(c) to impose consecutive sentences). The Supreme Court, in Abbott v. United States, __ U.S. __, 131 S. Ct. 18, 178 L. Ed. 2d 348 (2010), agreed with the interpretation we had adopted, concluding, "[w]e hold, in accord with the courts below, and in line with the majority of the Courts of Appeals, that a defendant is subject to a mandatory, consecutive sentence for a § 924(c) conviction, and is not spared from that sentence by virtue of receiving a higher mandatory minimum on a different count of conviction." Id. at 23. We therefore affirm the district court's decision imposing the Count 7 sentence consecutively.

V.

For the foregoing reasons, the convictions of Perez, Del Monte, Fernandez and Davila are AFFIRMED. Del Monte's sentences on Counts 7 and 8 are also AFFIRMED. Perez's sentences on Counts 1, 5, 6, and 7 are VACATED, and his case is REMANDED so that Perez may be afforded his right of allocution.

SO ORDERED.