[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-13826
Non-Argument Calendar
_____

D.C. Docket No. 3:08-cr-00079-MCR-11

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARK DANIEL LEITNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 14, 2014)

Before HULL, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Defendant-appellant Mark Daniel Leitner appeals his conviction for conspiracy to defraud the United States and to commit wire fraud, in violation of 18 U.S.C. § 371.  After careful review, we affirm Leitner's conviction.

In 2010, after a month-long trial, a jury convicted Leitner, as well as eight of his co-defendants, of a dual object conspiracy to impede the government's assessment and collection of taxes and to defraud customers of Pinnacle Quest International ("PQI").  Leitner was a salesman for PQI and sold memberships in PQI falsely representing the membership would show the individuals how to conceal income and avoid paying their taxes and credit card debt.

On appeal, Leitner raises two issues: (1) whether there was sufficient evidence for a reasonable jury to convict him of the conspiracy offense; and (2) whether the district court committed reversible error in admitting the government's evidence of the arrests and prosecutions of individuals who had worked for PQI's predecessor organization selling these same type of memberships.

We recently considered the consolidated appeals of four of Leitner's co-defendants.  See United States v. Merino, No. 10-14722, --- F. App'x ----, 2013 WL 5996040 (11th Cir. Nov. 13, 2013).  That decision involved sufficiency of the evidence issues regarding the convictions of Leitner's co-defendants, and addressed the same evidentiary issue that Leitner raises here.  Although this Court's decision in Merino does not control our analysis of the issues here, it is

nevertheless instructive.  Moreover, Merino provides background information about the overall criminal conspiracy which we need not repeat here.  We thus focus exclusively on defendant Leitner's role in PQI and the evidence to support his personal involvement in that criminal conspiracy.

## I.  TRIAL EVIDENCE PERTAINING TO LEITNER

The indictment alleged and the government proved at trial that Leitner worked as a "qualified consultant" for PQI.  In this role, Leitner sold PQI memberships to individuals.  At trial, extensive evidence showed that, as a qualified consultant, Leitner sold information intended to help individuals flaunt tax laws.

## A.    Communications with Undercover IRS Agent Hampton

An undercover Internal Revenue Service ("IRS"), Theresa Hampton, testified that, in 2003, she accessed a website, "nettaxfreedom.com."  Agent Hampton requested additional information from the website's operator.  In response, she received an email stating, "'Are you still paying taxes? Did you know that most people are legally and lawfully eligible to be tax exempt?  This invitation comes directly from the Internal Revenue Service.'"

Using a false identity, Agent Hampton responded to this email by requesting additional information.  Agent Hampton then received another email, this one

3

coming from the address "PQIServices@aol.com."  The second communication

stated:

> "Hi, my name is Mark Leitner and I am a consultant for the educational organization PQI.  We are for expert consultation, education and services in the area of debt elimination, asset protection, and freedom and privacy . . . .  If you are looking to reduce or eliminate your income tax burden legally and immediately, then this is information that can help you.  Our education will blow your socks off and leave your toes smoking.  And we have a money back guarantee to . . . .  back that statement up.
>
> . . . .
>
> "[Y]ou may also wish to be introduced to a few of the many people that have taken advantage of our services and who are now living a tax-free lifestyle, people like doctors, CPAs, attorneys, housewives, business executives, construction workers, nurses, and many other Americans just like you.  We have helped tens of thousands.  Our financial tools and processes are applicable to almost everyone.  W-2 wage earners will be able to keep most of their paycheck in as soon as several weeks time.  Our experts will handle all paperwork and correspondence for you.
>
> . . . .
>
> "I am looking forward to speaking with you and hope to help you on your way to living completely income tax and debt free.  You will find beyond a doubt that PQI's education services will elevate you above the vast majority of Americans in knowledge and financial freedoms.  You will have many advantages and opportunities that most Americans will never know about.
>
> . . . .
>
> "I look forward to speaking to you soon, prosperously yours, Mark Leitner."

4

Defendant Leitner also telephoned Agent Hampton and left a message on her voicemail.  The government played a recording of Leitner's message for the jury.  Agent Hampton returned Leitner's call.  During the ensuing conversation, Leitner told Agent Hampton about PQI's various tax elimination products, including the IMF Decoder.  Agent Hampton testified that Leitner assured her that, after purchasing a PQI membership and using PQI's IMF Decoder, she "wouldn't have to pay any more taxes."

After this telephone conversation, Leitner started sending Agent Hampton daily emails.  In these emails, Leitner tried to convince Agent Hampton to purchase a PQI membership, and provided her with links to articles on tax and debt elimination.  One article purported to "contain all that would be needed to get the IRS off your back."

Later during the course of her investigation, Agent Hampton, again, using a false identity, purchased a Q1-level PQI membership directly from Leitner for $1,280.  After doing so, Agent Hampton received an email from the address "ClientCare@support@PQI.cc."  The email assured her that defendant Leitner "is a qualified consultant in good standing with PQI."  Agent Hampton later learned that a large portion—$1,000—of the money she paid for her PQI membership went directly to Leitner.

5

After purchasing her PQI membership, Agent Hampton remained in contact with Leitner.  Leitner introduced Agent Hampton to other PQI vendors and advised her that she should "control [assets] and not own them."  Later on, Agent Hampton purchased a Q2-level PQI membership.  Once again, Agent Hampton made this purchase through Leitner because, as she described, "he was my upline person, which was the person who I contacted for everything.  I had to go to him for anything that I did."

When Agent Hampton became a Q2-level member, PQI invited her to attend conferences.  Before going to a conference, Agent Hampton had to sign a document, in which she "agree[d] not to disclose to any person who is not in attendance at [the] conference—at [the] event, any conference information or speaker contacts."  Leitner explained this provision to Agent Hampton stating that she "didn't want to talk about this with people who were not like-minded like ourselves because they wouldn't understand."

Later on, Agent Hampton became a PQI consultant herself, purporting to sell PQI memberships.  As a PQI consultant, she received emails from defendant Leitner via another one of Leitner's addresses, "truthandfreedom1@aol.com."  On April 15, 2005, Leitner sent Agent Hampton an email from that address, writing: "In case you don't already know, the IRS is a fraud, and the vast majority of Americans do not owe income taxes. . . .  In honor of April 15, which is just

6

another day for me, I have posted below the attached different proofs of what I'm saying, along with ways to research getting out of paying fraudulent income taxes and keeping the hard-earned money for yourself."

Leitner did more than try to convince Agent Hampton that she did not have to pay taxes. He also falsely promised Agent Hampton that the PQI vendors' products would enable her to not pay her taxes or credit card debt with impunity. For example, Leitner described the IMF Decoder (also called "IMF Codebusters") product as "a letter-writing campaign to . . . take you out of the tax system." He told Agent Hampton that, after using the IMF Decoder, she "wouldn't have to pay any more taxes." The government's evidence showed that Leitner received $150 for each PQI member he referred to IMF Decoder. Leitner also referred Agent Hampton to the PQI website, which falsely stated that PQI vendors' products would make her "lien, levy, and judgment proof."

## B.    Recruiting of Andrew Cordova

Agent Hampton was not the only witness who described Leitner's marketing activities for PQI. Andrew Cordova, testified that, in 2002, defendant Leitner persuaded him to purchase a PQI membership. Leitner told Cordova that PQI was "[b]asically an investment club" with "offers of areas to invest in" and "[v]arious plans on how to either avoid or not pay taxes." During their first meeting, Leitner told Cordova that he (Leitner) "wasn't paying taxes." Cordova learned that Leitner

7

had "structured" his finances so as to hide his assets from the government.  After one meeting with Leitner, Cordova decided to join PQI, purchasing a Q2-level membership for himself and his wife.  PQI charged approximately $9,000 per married couple for a Q2-level membership.  Cordova summarized his relationship with Leitner, stating: "Mark introduced me [to PQI], sold me the Q2 package, sold me on PQI being a viable entity and a good thing to be interested in."

Within the course of a year, Cordova lost $100,000 as a result of PQI-related activities.  Cordova testified that, after losing money, he "asked Mr. Leitner to look into this, and he said, oh yeah, he would talk to the leadership group again, and I never heard from Mark again."

## C.    Leitner's Failure to Pay Income Taxes

At trial, the jury also heard evidence that defendant Leitner failed to pay income taxes between 1999 and 2007.  An IRS records custodian testified that the IRS had conducted an audit and assessed penalties on Leitner for the years 1999, 2000, and 2001.  For those years, including penalties and interest, Leitner owed: (1) $3,599.75 for 1999; (2) $4,336.33 for 2000; and (3) $3,768.62 for 2001.  The records custodian also affirmed that "[t]here were no tax returns filed or received by Mark D. Leitner for [the] years, 2002 through 2007."

## II.  STANDARD OF REVIEW

In most cases, "[w]e review <u>de novo</u> whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial, viewing the evidence in the light most favorable to the government, and drawing all reasonable factual inferences in favor of the jury's verdict." <u>United States v. Beckles</u>, 565 F.3d 832, 840 (11th Cir. 2009).

However, when a defendant failed to "move for a judgment of acquittal prior to the district court's submission of the case to the jury or after the jury returned its verdicts . . . . we will uphold [the] conviction[] unless doing so would result in a manifest miscarriage of justice." <u>United States v. Perez</u>, 661 F.3d 568, 573–74 (11th Cir. 2011) (internal quotation marks and alterations omitted). This "manifest miscarriage of justice" standard requires us to affirm a conviction unless "the evidence on a key element of the offense is so tenuous that a conviction would be shocking." <u>Id.</u> at 574 (internal quotation marks omitted).

### III.  DISCUSSION

**A.    Sufficiency of the Evidence**

Here, Leitner did not move the district court for a judgment of acquittal, which triggers review for only a miscarriage of justice. <u>See Perez</u>, 661 F.3d at 573–74. However, even under <u>de novo</u> review, there was overwhelming evidence of Leitner's guilt, and we affirm his conviction.

9

The conspiracy statute under which the jury convicted Leitner criminalizes conspiracies to either: (1) commit any offense against the United States; or (2) defraud the United States.  18 U.S.C. § 371.  At trial, the government was required to prove: "(1) the <u>existence of an agreement</u> to achieve an unlawful objective; (2) the defendant's <u>knowing and voluntary</u> participation in the agreement; and (3) the <u>commission of an act</u> in furtherance of the agreement." <u>United States v. Adkinson</u>, 158 F.3d 1147, 1153 (11th Cir. 1998).  The indictment charged Leitner and his co-defendants conspired: (1) to defraud the United States by impeding and defeating the lawful functions of the IRS in the assessment and collection of taxes; and (2) to commit other offenses against the United States, specifically wire fraud in violation of 18 U.S.C. § 1343.

Here, the jury convicted Leitner of the dual object conspiracy to impede the IRS's assessment and collection of taxes and to defraud PQI customers.  As for the conspiracy to defraud the United States, the indictment alleged that Leitner and his co-defendants conspired to do so by defeating the lawful functioning of the IRS. In such a case, the government must show: "there was an <u>agreement</u> whose purpose was to <u>impede the IRS</u> (the conspiracy), and that each defendant <u>knowingly participated</u> in that conspiracy."  <u>Id.</u> at 1154.  "[F]ailure to properly report income can constitute the require act in furtherance of" such a conspiracy. <u>Id.</u>

At trial, the government's evidence showed that Leitner and his co-defendants voluntarily formed PQI or joined with the purpose of distributing information on schemes to avoid taxes. Leitner does not dispute his role in PQI, or PQI's stated mission. Leitner's primary argument is that he did not intend to defraud the United States because he thought the products he sold were legal. The evidence at trial refuted this argument too.

Evidence showed that Leitner sent emails to prospective PQI customers, such as Agent Hampton and Cordova, filled with statements about the illegality of the IRS. Although Leitner now argues that he honestly believed the truthfulness of his assertions, this argument is specious at best.

The evidence also proved that the speakers at PQI conferences advocated for defiance of tax laws. Leitner required that Agent Hampton sign a confidentiality agreement before Agent Hampton attended a PQI conference. A reasonable jury could infer that Leitner knew that the conference speakers advocated illegal activity, and insisted that Hampton sign the confidentiality agreement so as to prevent law enforcement from learning about the agendas of these conferences.

There was also ample evidence that Leitner committed at least two overt acts in furtherance of the conspiracy to defraud the United States—he recruited individuals like Agent Hampton and Cordova to purchase PQI memberships and then avoid tax liability; and he personally failed to pay taxes for at least nine years.

11

As for the wire fraud conspiracy, the elements are: "(1) intentional participation in a scheme to defraud, and (2) the use of the interstate mails or wires in furtherance of that scheme." United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money." Id.

Moreover, "to prove a conspiracy to commit wire fraud, the government need not demonstrate an agreement specifically to use the interstate wires to further the scheme to defraud." United States v. Broughton, 689 F.3d 1260, 1277 (11th Cir. 2012) (internal quotation marks and alteration omitted). Rather, "it is enough to prove that the defendant knowingly and voluntarily agreed to participate in a scheme to defraud and that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable." Id. (internal quotation marks omitted).

Viewing the evidence in the light most favorable to the government, the evidence showed that Leitner participated in a scheme to defraud PQI customers by keeping from customers the fact that PQI memberships were essentially worthless. Ample evidence showed that Leitner and his co-defendants knew that the PQI vendors' products did not work. Nevertheless, the conspirators charged high rates for the right to purchase those ineffective products. A reasonable jury could thus infer, then, that the conspirators sold these memberships without

12

disclosing the uselessness of the PQI vendors' products in order to deceive the consumers out of money.

There was extensive evidence that Leitner himself knew that the PQI memberships were of no use to consumers.  For example, the government's evidence showed that Leitner made promises to Agent Hampton about the usefulness of the IMF Decoder product and encouraged her to purchase that product.  But, Leitner did not reveal to Agent Hampton that he had a personal financial incentive to persuade her to buy the product.  A reasonable jury could infer from this evidence that Leitner knew his claims about the IMF Decoder product were false, and that he only made them because he wanted to receive a commission from IMF Decoder.

A reasonable jury could also infer that Leitner knew that the PQI vendors' products did not work from Cordova's testimony that he (Cordova) told Leitner about his substantial financial losses as a result of using a PQI vendor product, that Leitner promised to investigate, and then promptly stopped communicating with Cordova.  Cordova indicated that this occurred sometime in 2003.  However, Agent Hampton testified that between 2003 and 2005, Leitner made numerous sales pitches to her and promises about the value of PQI memberships.  A reasonable jury could conclude from this evidence that Leitner encouraged Agent

13

Hampton to buy a PQI membership and use PQI vendors' products knowing that at least one PQI member, Cordova, had lost $100,000 as a result of those products.

On the use of interstate wires element, the government introduced numerous emails that Leitner wrote and sent to individuals in other states to further the conspiracy's fraudulent scheme. The government also introduced evidence of traditional wire transfers of cash made by Leitner's co-conspirators in furtherance of the conspiracy. Thus, this element was satisfied too. See Merino, --- F. App'x at ----, 2013 WL 5996040, at *1.

In sum, there was extensive evidence to support defendant Leitner's conviction for knowingly and voluntarily joining and participating in the dual object conspiracy to defraud the United States by impeding the government's assessment and collection of taxes and to commit wire fraud by defrauding PQI's customers. We thus reject Leitner's sufficiency of the evidence challenge to his conviction.

**B.    Admission of Evidence About PQI's Predecessor Organization**

For the first time on appeal, Leitner also argues that the district court erred in admitting the government's evidence about the arrests and prosecutions of individuals associated with PQI's predecessor organization, Institute for Global Prosperity ("Global"). Leitner maintains that the probative value of this evidence

14

was substantially outweighed by the danger of unfair prejudice in violation of Rule 403 of the Federal Rules of Evidence.  See Fed. R. Evid. 403.

Evidence showed that Global was formed in 1996 and operated until 2002. Global's business model was very similar to the one PQI later adopted.  Global sold access to written materials and offshore seminars espousing the view that "there was no requirement to file income taxes."  There were also four levels of Global memberships a customer could buy, similar to PQI's three-level membership structure.  Moreover, Global's salesmen received commissions on each new membership they sold, much like the commissions PQI's salesmen (including Leitner) later received.

Global disbanded in 2002 after coming under investigation by the IRS.  As one witness testified, in response to the IRS investigation, some of Global's leaders decided "Global was going to disappear, and it was going to become another company called [Pinnacle] Quest International."  One former Global executive stated that the plan was "that they were just going to take all the people from Global and grandfather them in."  Leitner, who had been a Global member and salesman, was grandfathered into PQI on May 17, 2002.

The government offered evidence at trial to show that the founders and owners of Global, as well as several Global employees were convicted of tax-related offenses.  Evidence also showed that several of Leitner's co-defendants

15

specifically knew about the convictions of these Global owners and employees. This evidence countered the defendants' arguments that they did not know that PQI's activities were illegal.

Leitner did not object at trial to the introduction of this evidence. Normally, "when a party raises a claim of evidentiary error for the first time on appeal, we review it for plain error only." United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005). In order to reverse for plain error, there must be (1) error, (2) that is plain, and (3) that affects substantial rights, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 1202–03. However, Leitner's co-defendants did object to the evidence. Leitner apparently asks us to treat his co-defendants' objections as effectively preserving the issue for him on appeal and thus triggering abuse of discretion review.

We need not decide whether to apply plain error or abuse of discretion review. Even if we adopt Leitner's position, the district court did not abuse its discretion by admitting the evidence about the Global owners and employees. The government did not offer the evidence to show propensity or guilt by association. Rather, the evidence showed that Leitner and his co-defendants knew that the products they were selling (which were substantially similar to those sold by the Global employees previously) were fraudulent. The evidence was particularly probative as to the guilt of a co-defendant like Leitner, who had worked for Global

16

and was grandfathered into PQI.  Because Leitner argued that he did not know that what he did for PQI was illegal, the evidence about Leitner's affiliation with Global, and the prosecution of the Global individuals was extremely probative in rebutting Leitner's defense.

Leitner emphasizes that the government "failed to establish whether Leitner had any connection to these [Global] individuals; whether he even knew them, whether he knew about any of their activities, whether he had known of their associations with other codefendants, and whether they were part of the alleged conspiracy here."  However, it does not matter that the government did not offer direct evidence of Leitner's knowledge of the prosecutions of the Global individuals.  The government's evidence showed Leitner's involvement in Global and in PQI, and from this evidence, a reasonable jury could infer that Leitner knew the reason Global was stopping operations and was being replaced by a new entity, PQI.

Moreover, each defendant was free to argue that he or she was not aware of those arrests, prosecutions, and convictions.  Furthermore, the district court provided a lengthy and highly specific limiting instruction immediately after the evidence was introduced, which Leitner's co-defendants approved of.

17

In light of this record, we cannot say that the evidence about the Global

individuals violated Rule 403.  <u>See</u> Fed. R. Evid. 403.  Accordingly, the district

court did not commit plain error, or abuse its discretion by admitting the evidence.

In light of the foregoing, we affirm Leitner's conviction.

**AFFIRMED.**