[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14727

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

*versus*

JAMES FARRELL WILKERSON,
a.k.a. James Ferrell Wilkerson,
a.k.a. Spot,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:19-cr-00027-AW-GRJ-1

_____

Before GRANT, BRASHER, and ANDERSON, Circuit Judges.

PER CURIAM:

James Wilkerson appeals his conviction for possession of a firearm by a convicted felon and resulting sentence of 235 months' imprisonment. He argues that the government failed to present sufficient evidence for a reasonable jury to find that he constructively possessed the firearm. He also argues that his sentence was procedurally unreasonable because the district court erred in applying the armed career criminal enhancement where his prior conviction for cocaine trafficking under Ga. Code § 16-13-31(a)(1) does not qualify as a predicate felony under the Armed Career Criminal Act ("ACCA"). He further argues that his sentence was substantively unreasonable because the district court gave too much weight to his criminal history and failed to consider other factors. Finding sufficient evidence to support the conviction and no sentencing errors, we affirm.

I.

A grand jury indicted Wilkerson on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e). At trial, the government presented Gainesville Police Department (GPD) detective John Pandak, who testified to the following. The arrest occurred at a popular hangout spot and high-crime area on a vacant lot known as "the Slab." Pandak's unit had been searching for evidence regarding a gunshot homicide that

had occurred the week before and a shootout at the Slab the week before that. Just north of the Slab, the detectives came across a "campsite type area." The campsite had a tent, with two people inside. Pandak approached to ask whether they knew anything about the crimes. He immediately smelled marijuana inside the tent, Wilkerson was sitting in a chair, accompanied by Dejanee Petty. Pandak noticed something balled up in Wilkerson's hand and ordered Wilkerson to reveal it, but Wilkerson refused. Pandak grabbed one of Wilkerson's arms, while his boss, Sergeant Blizzard, grabbed the other, and "within seconds [they] sort of just fell to the ground." Wilkerson tried to pull away, but the detectives hand-cuffed him and removed him from the tent. Pandak did not work up a sweat (it was not a hot day) nor suffer any injuries. He did not get any blood on his hands or bloodstains on his clothes. Wilkerson did not sweat or get injured.

Pandak further testified as follows. He searched the tent and found inside on the ground, a white plastic bag containing a holstered pistol. He also found a marijuana blunt and a small bag of marijuana that Wilkerson had been holding. The detectives took several photographs: some of the pistol and one of where they had found the pistol next to Wilkerson's chair. Pandak had moved the chair while searching the tent and again before taking the photo, but the pistol would have been next to Wilkerson's feet. Pandak had also moved the firearm, "carefully, with two fingertips or so," and "flipped it over on its side, touching only the holster and not the firearm itself." He was not wearing gloves.

The government then presented Blizzard, who testified as follows. Blizzard and Pandak were investigating a shootout and separate homicide that had occurred near the Slab when they encountered Wilkerson in the tent. Wilkerson attempted to stand up; the detectives commanded him to sit back down. Wilkerson did not comply, the detectives grabbed his hands, and a "small little tussle" ensued, which lasted between 8 and 10 seconds. It was not particularly hot; Blizzard did not work up a sweat or get injured or observe injuries to Pandak or Wilkerson. He did, however, notice a small abrasion on Wilkerson's left wrist from the handcuffs. He corroborated that Pandak had found the pistol in a white plastic bag in front of where Wilkerson's toes had been.

The government presented Petty, an acquaintance of Wilkerson's, who testified as follows. They had been in the tent for 30 or 45 minutes when the detectives "came in [] very aggressive." After "tussling" with Wilkerson, they "started kicking the trash." She remained seated after they had removed Wilkerson from the tent and watched as they discovered a pistol—which she had never seen. She would have noticed it if it had been near Wilkerson's feet. The day was hot; Wilkerson was "sweating bad."

The government presented the testimony of Hayley Miller, who testified that she was the GPD Officer that collected the evidence and further testified as follows. Usually, she would collect evidence in GPD-issued paper evidence bags, but because she had exhausted her supply that day, she put the pistol, bag of marijuana, and blunt into a single plastic Publix bag from the trunk of her car.

18-14190                Opinion of the Court                5

She did not see blood on any of the items. She may have collected Wilkerson's hat, but she would have kept it separate from the other items.

The government also presented the testimony of Lauren Foong, who testified that she was a former GPD crime scene investigator who had forensically processed the evidence and further testified as follows. When she received the Publix bag and hat, the pistol was still in its holster, the magazine was still in place, and the pistol was loaded with ammunition. There were no visible signs of blood or sweat. She swabbed the pistol and magazine separately, using a different swab for each item. She did not change gloves between handling the pieces of evidence. However, she photographed each item before swabbing it, and her photo of the pistol was timestamped as having been taken 30 minutes earlier than her photo of the hat.

The government presented the testimony of DNA analyst, Amanda Stratton, who testified that she had analyzed the DNA and further testified as follows. She found DNA on both the pistol and magazine from three individuals and it was 700 billion times more likely than not that one of them was Wilkerson. The DNA that matched Wilkerson's constituted 94 percent of the sample from the pistol and 93 percent of the sample from the magazine. Such a large amount of DNA could "possibly" have been transferred onto the pistol and magazine by someone handling the items without gloves or from the items in the Publix bag, but only through wet bodily fluid—which she did not observe. The DNA results were

most likely the result of repeated handling of the pistol by its primary user.

After the government rested, Wilkerson moved for a judgment of acquittal based on insufficiency of the evidence as to possession of the pistol. He argued that no one ever saw Wilkerson touch, handle, or possess the pistol; the pistol had been found on a vacant lot owned by the city; the photographs did not show the original positioning of the pistol or surrounding items; the pistol had not been in plain view or anywhere where he could have exercised possession and control; he did not know the gun was there; people were in and out of the tent all the time; no one knew who owned the tent; and the DNA evidence was contaminated by mishandling. The court denied the motion.

Wilkerson presented the testimony of DNA consultant Candy Zuleger, who, like Stratton, testified that she had analyzed the DNA evidence. Zuleger testified she found DNA from three individuals on the pistol and calculated that it was 700 billion times more likely than not that one of the three was Wilkerson. However, her results showed that the quantity of Wilkerson's DNA on the pistol was "in the range of a secondary transfer." Moreover, she testified that Wilkerson's DNA could have transferred to the pistol as a result of Pandak's handling of the pistol without gloves after contact with Wilkerson's sweat, abrasions, or skin cells, or could have been transferred in the Publix bag from the blunt wet with saliva, or from Foong's handling the items without changing gloves.

## II.

We review *de novo* the sufficiency of the evidence to support a conviction, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). A district court's denial of a motion for a judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt. *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000).

Federal law prohibits possession of a firearm by a convicted felon. 18 U.S.C. § 922(g). Possession of a firearm may be actual or constructive and proven through direct or circumstantial evidence. *United States v. Iglesias,* 915 F.2d 1524, 1528 (11th Cir. 1990). To establish constructive possession, the government must show that the defendant "(1) was aware or knew of the firearm's presence and (2) had the ability and intent to later exercise dominion and control over that firearm." *United States v. Perez*, 661 F.3d 568, 576 (11th Cir. 2011). A defendant's presence in the vicinity of a firearm is insufficient to establish constructive possession. *Id.*

Here, the government presented sufficient evidence to support Wilkerson's conviction, particularly that he constructively possessed the pistol. Viewing the evidence in the light most favorable to the government, a reasonable jury could conclude that

almost all the DNA found on the pistol and its magazine was Wilkerson's.  The evidence indicated that such a large amount of DNA could only have gotten there through wet bodily fluid or repeated handling.  Because Wilkerson was neither sweating nor bleeding when he was arrested a reasonable jury could find beyond a reasonable doubt that Wilkerson had repeatedly handled the weapon and his DNA was not transferred to the weapon by the officers who had just arrested him.  Because the pistol was also discovered near where he had been sitting, a reasonable jury could find that he knew it was there and had the ability and intent to exercise dominion and control over it.

Although there was contrary evidence—e.g. evidence from the defense expert of the possibility that Wilkerson's DNA could have been on the pistol and magazine as a result of secondary transfer—there was ample evidence on the basis of which the jury could find that the DNA was Wilkerson's as a result of repeated handling. We affirm Wilkerson's conviction.

### III.

When reviewing the reasonableness of a sentence, we must first ensure that the district court committed no significant procedural error.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  We then review for substantive reasonableness under the totality of the circumstances.  *Id.*

### A.

18-14190                Opinion of the Court                9

We review *de novo* whether a prior conviction qualifies as a serious drug offense under the ACCA. *United States v. White*, 837 F.3d 1225, 1228 (11th Cir. 2016). In conducting this review, we are bound to follow a prior binding precedent unless and until it is overruled by this court sitting *en banc* or by the Supreme Court. *Id.*

The ACCA mandates a 15-year minimum sentence for a defendant who is convicted of possessing a firearm as a convicted felon and who has at least 3 separate prior convictions for a "violent felony" or a "serious drug offense." 18 U.S.C. § 924(e)(1). The statute defines "serious drug offense" as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." § 924(e)(2)(A)(ii). We have adopted an expansive interpretation of the word "'involving'" in this definition. *United States v. Conage*, 976 F.3d 1244, 1249 (11th Cir. 2020).

Federal courts use the "categorical approach" to decide whether a state court conviction qualifies as a serious drug offense under the ACCA. *Shular v. United States*, 140 S. Ct. 779, 783 (2020). The categorical approach asks courts to look "only to the statutory definitions of the prior offenses" and not "the particular facts underlying the prior convictions" or "the label a State assigns to the crimes." *Id.* (quotation marks and brackets omitted). Under the categorical approach, "a conviction qualifies as a serious drug offense only if the state statute under which the defendant was convicted defines the offense in the same way as, or more narrowly

than, the ACCA's definition of a serious drug offense." *Conage*, 976 F.3d at 1250. Thus, "[i]f even one method of sustaining a drug trafficking conviction does not qualify as a serious drug offense, then the entire statute is disqualified as a predicate conviction for ACCA purposes." *Id.* at 1251.

Wilkerson had a previous conviction for trafficking cocaine under O.C.G.A. § 16-13-31 that the district court used to enhance his sentence under the ACCA. That statute provides that "any person who sells, manufactures, delivers, or brings into this state or who is in possession of 28 grams or more of cocaine . . . commits the felony offense of trafficking in cocaine." O.C.G.A. § 16-13-31. Wilkerson argues that the language "brings into this state" does not satisfy the ACCA definition of serious drug offense because it can be accomplished without conduct connected to, attendant with, or in any way touching the conduct of manufacturing, distributing or possession with intent to distribute cocaine.

We have addressed a similar argument about whether a violation of Fla. Stat. § 893.135(1)(b) qualifies as a serious drug offense under the ACCA where one method of violating the statute is by "purchasing" 28 grams of cocaine.[1] *Conage*, 976 F.3d at 1248,

---

[1] Prior to *Conage*, we had held that a violation of § 893.135(1)(b) qualified as a serious drug offense. *Conage*, 976 F.3d at 1253 (citing *United States v. James*, 430 F.3d 1150 (11th Cir. 2005) (holding that defendant's prior conviction under Fla. Stat. § 893.135(1)(b) qualified as a serious drug offense because possession of more than 28 grams of cocaine implies an intent to distribute)). However, we had not previously addressed whether the purchasing element

1253. We first acknowledged that possession of more than 28 grams of cocaine necessarily implies intent to distribute and thus qualifies as a serious drug offense under the ACCA. *Id.* at 1254. We then framed the issue as whether "purchasing" necessarily involves possession under Florida law. *Id.* at 1255. Recognizing the possibility that the term "purchase" could be interpreted by the Florida Supreme Court as not necessarily involving possession or constructive possession, and because we could not find a definitive answer, we certified the question to the Florida Supreme Court. *Id.* at 1255-63.

Although we have previously examined § 16-13-31 to determine if a conviction under it is a predicate felony under ACCA, we have not addressed this precise issue. In *Hollis*, we found that a defendant's prior conviction under § 16-13-31(a)(1) qualified as a predicate felony under the ACCA. 958 F.3d at 1122-23 (reaching this conclusion in deciding whether, in 28 U.S.C. § 2255 proceedings, defendant had shown that his lawyer was deficient for not arguing that the Georgia conviction was not a serious drug offense). We reasoned that a violation of § 16-13-31(a)(1) satisfies the ACCA definition of a serious drug offense because, by making possession of more than 28 grams a "trafficking" offense, the statute infers intent to distribute from a defendant's possession of the specified

---

of the statute met the requirements for a serious drug offense under the ACCA. *Id.* Thus, the prior panel precedent rule did not preclude us from considering that issue. *See id.* at 1253-54.

amount of cocaine. *Id.* at 1124. However, we did not consider whether "brings into this state" also infers intent to distribute. *See id.* at 1123-24. Because we did not consider that argument, the prior panel precedent rule does not foreclose Wilkerson's argument.

Although Georgia law does not address whether § 16-13-31(a)(1)'s "brings into this state" requires possession, Georgia courts have held that the statute's reference to possession can include constructive possession. *Williams v. State*, 199 Ga. App. 566, 570, 405 S.E.2d 716, 720 (1991). The Georgia courts have also noted that the statute explicitly provides that the necessary mens rea is that the defendant knows he or she possesses the substance and knows that it is cocaine. *Wilson v. State*, 312 Ga. App. 166, 169, 718 S.E.2d 31, 34 (2011), aff'd, 291 Ga. 458, 729 S.E.2d 364 (2012).

Under the Georgia statute, the relevant term—"brings into the state"—differs from "purchase"—found in the Florida statute examined in *Connage*—in that "brings" connotes possession more clearly than does the term "purchase." Indeed, it arguably is impossible to bring something somewhere without at least constructively possessing it; otherwise, someone or something else would have brought it. We decline to assume an unnatural definition of "brings" to disqualify § 16-13-31(a)(1) as a predicate felony. The district court did not procedurally err by applying the ACCA enhancement to Wilkerson's sentence.

**B.**

We review a sentence for substantive reasonableness using a deferential abuse-of-discretion standard. *Gall*, 552 U.S. at 51. Under this standard, a district court abuses its discretion when it (1) fails to consider relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment by balancing the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*). The proper factors are set out in § 3553(a) and include the nature and circumstances of the offense, the criminal history of the defendant, the seriousness of the crime, adequate deterrence, and protection of the public. 18 U.S.C. § 3553(a).

We have emphasized that we must give due deference to the district court's consideration and weight of the proper sentencing factors. *United States v. Shabazz*, 887 F.3d 1204, 1224 (11th Cir. 2018). Though the district court must consider all the § 3553(a) factors, it need not mention each factor explicitly at the sentencing hearing. *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007). The district court also need not give all the factors equal weight and has discretion to attach great weight to one factor over another. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). Along with the § 3553(a) factors, the district court should also consider the particularized facts of the case and the guideline range. *Id.* at 1259-60. However, it maintains discretion to give heavier weight to any of the § 3553(a) factors or

combination of factors than to the guideline range. *Id.* at 1259. We ordinarily expect a sentence within the Guidelines range to be reasonable. *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). Another indicator of reasonableness is that a sentence is well below the statutory maximum. *Id.*

Here, Wilkerson's sentence is not substantively unreasonable. The district court stated that it considered all the § 3553(a) factors, mentioned that it had considered the mitigating factors, and had discretion to weigh the factors differently. The district court did not abuse its discretion in weighing the factors to arrive at a sentence within the guidelines range and well below the statutory maximum. We affirm Wilkerson's sentence.

**AFFIRMED.**